**Sheldon L. Pollock**
**Wendy B. Tepperman**
**David Stoelting**
**Amy Mayer**
**Kevin Oswoski**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**212-336-0174 (Stoelting)**
**StoeltingD@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| Plaintiff, | **25 Civ. _____ (    )** |
| -against- | |
| **SRINIVAS KONERU,** | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("SEC" or "Commission"), for its

Complaint against Defendant Srinivas Koneru ("Koneru" or "Defendant"), alleges as follows:

**SUMMARY**

1.      This action involves a fraudulent scheme by Koneru in connection with the

November 2020 business combination ("Business Combination") of his private company,

Triterras Fintech Pte. Ltd. ("Triterras Fintech"), with Netfin Acquisition Corp. ("Netfin"), a

Nasdaq-listed special purpose acquisition company ("SPAC") that generated $60 million in cash

to Koneru and, ultimately, substantial losses to investors.  Koneru made numerous deceptive and

misleading statements about the nature and details of Triterras Fintech's business before and

after the Business Combination to create a false picture for investors.  As a result of this conduct, Koneru violated the federal securities laws.

2.      Triterras Fintech's principal asset was its online commodities trade and trade finance platform "Kratos."  To persuade Netfin's shareholders to vote in favor of the Business Combination and accept the exchange of their Netfin securities for securities to be issued by the surviving public company (rather than redeem them at a price of around $10 per share), Koneru made highly misleading statements about Kratos.  Koneru, as Triterras Fintech's founder and owner, portrayed Kratos to investors as transforming the physical commodity trade and trade finance industry with its two modules on which it charged fees: a "Trade Discovery" module that allowed small and medium enterprise ("SME") traders to conduct and document trades and a "Trade Finance" module that delivered access to trade financing for SME traders from lenders on the platform.  Koneru held out Kratos's Trade Finance module as a solution for a claimed $1.5 trillion annual shortfall in trade finance funding for SME traders.  The ability to link traders with third-party lenders was a key feature of Kratos and a focus point for investors.

3.      Koneru represented through communications with investors and his approval of public filings that, by August 2020, Kratos had onboarded ten lending funds to its platform with billions of dollars in assets under management (the "Ten Lending Funds") and that the volume of financing by lenders in Kratos's Trade Finance module totaled $1.1 billion.

4.      As Koneru knew or recklessly disregarded, however, these and other similar representations about Triterras Fintech's Kratos platform were misleading.  In reality, only around 10% of the reported Trade Finance module volume and associated revenue involved the Ten Lending Funds that had been purportedly onboarded to the platform.  Moreover, the limited financing involving any of the Ten Lending Funds consisted of either lending to entities majority

2

owned by Koneru—namely, Rhodium Resources Pte. Ltd. and its subsidiaries (collectively, "Rhodium")—or lending by a Koneru owned trade finance fund, TAPL LP Interest Ltd. ("TAPL Fund"). Further, much of the financing by the Ten Lending Funds to Rhodium had been arranged without using the Kratos platform. As part of Koneru's scheme, he directed that some of these loans to Rhodium be added to the Kratos platform after the fact, creating the false impression that those loans originated on the platform and thereby deceiving investors.

5.     Rather than connect traders to the Ten Lending Funds or other third-party lenders for financing, approximately 90% of the reported Trade Finance module volume consisted of transactions between the trade counterparties themselves—a fact that Koneru concealed because it did not support the business case for Kratos's Trade Finance module that he promoted to investors; namely, that the module would help close the substantial funding gap for SME traders in the international physical commodities trading markets.

6.     Furthermore, nearly 40% of the total reported Trade Finance module volume from inception in February 2020 through August 2020 involved Rhodium acting as the purported "lender" to its own trade transaction counterparty, which was concealed from investors and not reflected in the related party disclosures that were made in the public filings.

7.     Koneru knew or recklessly disregarded that the statements he made omitted all of this material information, thereby leaving investors with a false impression of the extent to which the demand for Kratos's Trade Finance module had been proven.

8.     Based on this false picture of Triterras Fintech's business, Netfin's shareholders overwhelmingly voted to approve the Business Combination on November 10, 2020, and less than 3% of Netfin's public shares were submitted for redemption at a price slightly above $10 per share. As a result, Koneru received $60 million in cash consideration, obtained a controlling

equity stake in the surviving public company, Triterras, Inc. ("Triterras"), and became Triterras's CEO and Executive Chairman.  Following the Business Combination closing, Triterras shares and warrants began trading on Nasdaq on November 11, 2020.

9.      Koneru, through communications with investors and his approval of Triterras public filings, then continued to make misleading statements to the investing public that touted Kratos's Trade Finance module volume while concealing material facts. Unbeknownst to investors, even through at least February 28, 2021, the Ten Lending Funds had not provided *any* financing through the Trade Finance module that did not involve related parties of Triterras.

10.      Ultimately, Netfin and Triterras investors suffered substantial losses.  By June 2022, after being delisted by Nasdaq, Triterras stock was trading on the over-the-counter markets at below $1 levels.  In 2025, all the public securities of Triterras were acquired for $0.10 per share by a company owned and controlled by Koneru and Netfin's former CEO.

## VIOLATIONS

11.      By virtue of the foregoing conduct and as alleged further herein, Defendant Koneru has violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

12.      Unless Defendant is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

13.      The SEC brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act

Section 21(d) [15 U.S.C. § 78u(d)].

14.     The SEC seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws and rules that this Complaint alleges he has violated; (b) ordering Defendant to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendant to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) prohibiting Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

16.     Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

17.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa] because certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District.  For example, during the time of the misconduct, securities of Netfin and Triterras traded on Nasdaq,

an electronic securities exchange located in this District.  Further, the meeting site for Netfin's shareholder vote on the proposed Business Combination of Netfin and Triterras Fintech took place in this District.  Certain Netfin and Triterras shareholders were also located in this District.

## DEFENDANT

18.    **Koneru**, age 65, is a United States citizen.  During 2020 and 2021, Koneru was a resident of Singapore, and he now lives in Dubai.  Koneru co-founded Rhodium, a commodities trading firm, in 2012 and founded Triterras Fintech in 2018. Prior to the Business Combination, Koneru was the CEO, sole director, and sole indirect shareholder of Triterras Fintech.

## RELEVANT ENTITIES

19.    **Netfin**, a Cayman Islands exempted company with its principal executive office in New York, New York, was a SPAC that, following its initial public offering ("IPO") on August 2, 2019, consummated the Business Combination on November 10, 2020, with Triterras Fintech to form a new public company, Triterras.

20.    **Triterras Fintech** (f/k/a Arkratos Blockchain Solutions Pte Ltd.), a Singapore private company, was founded by Koneru in 2018.  Prior to the Business Combination, Triterras Fintech was 100% owned indirectly by Koneru through two holding companies: IKON Strategic Holdings Fund ("Ikon") and Symphonia Strategic Opportunities Limited ("Symphonia").  In connection with the Business Combination, Triterras Fintech became a wholly owned subsidiary of Triterras.

21.    **Triterras** (f/k/a Netfin Holdco), a Cayman Islands exempted Singapore company with its principal executive office in Singapore, was the surviving public company that resulted from the consummation of the Business Combination of Netfin with Triterras Fintech on November 10, 2020.  Upon the closing of the Business Combination, Koneru became Triterras's

CEO and Executive Chairman and was issued a controlling equity stake in Triterras. Triterras issued shares and warrants to Netfin security holders, which began trading on Nasdaq under the tickers TRIT and TRITW, respectively, and then were quoted on the OTC Expert Market after Nasdaq suspended trading in and delisted Triterras in 2022. In 2025, the public securities of Triterras were acquired for $0.10 per share by TRIRF Acquisition Corp.—a company owned and controlled by Koneru and Netfin's former CEO.

22.     **Rhodium** was a Singapore-based commodity trading business co-founded in 2012 by Koneru and majority owned and controlled by Koneru with direct and indirect subsidiaries operating as commodity trading businesses in other countries. Rhodium was renamed Antanium Resources Pte. Ltd. as of December 10, 2020.

23.     **TAPL Fund** was a Cayman Islands-based trade finance fund founded and indirectly owned by Koneru.

## FACTS

## I.     KONERU'S FORMATION OF TRITERRAS FINTECH AND LAUNCH OF THE KRATOS PLATFORM

24.     Koneru founded Triterras Fintech (then named Arkratos Blockchain Solutions Pte Ltd.) in January 2018 as an outgrowth of Rhodium's commodities trading business.

25.     Koneru sought, through Triterras Fintech, to develop an online platform for physical commodities trade and trade finance and to transition offline paper-based physical commodities trade and trade finance for SME traders to a blockchain-enabled digital marketplace that allowed the traders to document and track their trade transactions and to access trade finance.

26.     In 2018, Koneru and his team conducted a pilot, and in 2019 Koneru hired a full development team to work on the platform.

27.     Triterras Fintech held out the Kratos platform as a way to serve SME international physical commodities traders who act as intermediaries between producers of commodities, such as grains and oil seeds, and cross-border buyers.

28.     Commodities traders pay the seller at or before shipment, but do not collect from the buyer until on or after delivery, typically 120 to 150 days after purchase.  Traders can fund their payments to the sellers by using the trader's cash; a letter of credit; or by borrowing funds from a trade finance lender.

29.     Accordingly, as later described in Triterras's public filings, the Kratos platform was "built to address the needs of SMEs in the commodity trading and trade financing community by connecting commodity traders and lenders and enabling them to transact online."

30.     In mid-2018, Koneru and his team conducted a pilot program of the Kratos platform.

31.     As set out in Netfin's Definitive Proxy Statement filed on October 29, 2020, a Form F-4 registration statement filed by Triterras (then named Netfin Holdco) on August 28, 2020, as amended, which was declared effective by the SEC on October 29, 2020, and a prospectus filed on October 29, 2020 (collectively, the "Proxy Statement")[1], Kratos's "Trade Discovery" module, which SME traders purportedly used to conduct and document physical commodities trades, was launched in June 2019.

32.     The Trade Finance module, which purportedly linked SME traders with lenders on the platform for trade financing, was launched in February 2020.

33.     According to these filings, Triterras Fintech earned revenue on the Trade Discovery module by charging a fee of 30 basis points ("bps") on the transaction volume when

---

[1] Unless otherwise indicated, references to the "Proxy Statement" are to the Definitive Proxy Statement dated October 29, 2020.

the buyers and sellers agreed to execute a physical commodity trade on Kratos and on users of the Trade Finance module by charging an additional financing sourcing fee 130 bps to the borrower on the amount being financed.

34.     A "basis point" is one hundredth of one percent; accordingly, the 130 bps Trade Finance fee would equal 1.3% of the loan amount.

## II.     TRITERRAS FINTECH'S BUSINESS COMBINATION WITH NETFIN

35.     On April 24, 2019, Netfin was incorporated for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses.

36.     On August 2, 2019, Netfin completed its IPO at a public price of $10 per unit.  A total of $253 million in proceeds raised were deposited into a trust account at a bank in the United States.

37.     Following the IPO, Netfin's securities were listed on Nasdaq under the ticker symbols NFINU, NFIN and NFINW.

38.     Prior to the Business Combination, Netfin had no operating business and its efforts were limited to organizational activities, completion of its IPO, and the evaluation of possible business combinations.

39.     According to the Proxy Statement, on August 5, 2019, Netfin's then-CEO called Koneru to discuss a potential business combination for Netfin with certain entities including Rhodium and Triterras Fintech.

40.     According to the Proxy Statement, Koneru was known to Netfin's CEO based on previous business affiliations and because Longview Resources Group, a Hong Kong-based commodity trading group (together with its subsidiaries, "Longview) founded in 2016 by

Netfin's CEO, was then an existing customer of Triterras Fintech and remained a customer as of the date of the Proxy Statement.

41.    In late September 2019, and again in early December 2019, Koneru met with Netfin officials in New York, New York, to discuss a potential business combination that would include Rhodium and Triterras Fintech.

42.    On June 29, 2020, Netfin filed a Form 8-K announcing a non-binding letter of intent for Netfin to acquire Rhodium and Triterras Fintech.

43.    Shortly thereafter, in July 2020, the transaction was revised to exclude Rhodium, such that Netfin would combine solely with Triterras Fintech.  As a result, Triterras Fintech, with its Kratos platform, became the only operating company that would emerge from the transaction in the surviving public company.

44.    On July 29, 2020, Netfin filed a Form 8-K, and Netfin also filed a Rule 425 prospectus with the same content including exhibits, announcing that it had entered into the Business Combination Agreement, pursuant to which, among other things, all of the issued and outstanding ordinary shares of Triterras Fintech would be acquired by a holding company, Netfin and Triterras Fintech would become subsidiaries of the holding company, the issued and outstanding securities of Netfin would be exchanged for securities in the holding company, and the holding company would be renamed "Triterras" upon consummation of the transactions contemplated by the Business Combination Agreement.

45.    A June 29, 2020, press release, which was furnished as an exhibit to the Form 8-K, and included in the Rule 425 prospectus, described Kratos as "one of the world's largest commodity trading and trade finance platforms that connects and enables commodity traders to trade and source capital from lenders directly online," and that Kratos "charg[es] fees to its users

on their trading and financing transaction volumes."

46.    In a "Call Script" included with the Form 8-K, and Rule 425 prospectus, Koneru described Kratos as a "digital marketplace" to "help traders access much needed trade finance," and that "[t]o date, we have onboarded funds that we estimate manage $17 billion of assets."

47.    Koneru signed the Business Combination Agreement on behalf of Ikon and Symphonia, which collectively owned 100% of Triterras Fintech.

48.    From August through early November 2020, Koneru participated in drafting and approving the Proxy Statement for the Business Combination and investor presentations. Koneru also participated in roadshows and investor calls seeking to persuade Netfin shareholders to approve the proposed transaction.

49.    Triterras's Form F-4 registration statement, as amended, was declared effective on October 29, 2020, and Netfin sent shareholders a definitive proxy statement/prospectus dated October 29, 2020.

50.    Netfin shareholders had until prior 5:00 p.m., Eastern time, on November 6, 2020 to exercise their redemption rights.

51.    On November 10, 2020, Netfin held a general meeting of shareholders in New York, NY, where Netfin shareholders voted in favor of the Business Combination.

52.    Afterwards, Triterras filed a Form 8-A for registration of its ordinary shares and warrant pursuant to Section 12(b) signed by Koneru.

53.    On November 11, 2020, shares and warrants issued by Triterras in connection with the Business Combination began trading on Nasdaq.

54.    Pursuant to the Business Combination Agreement, Koneru was named CEO and Executive Chairman of Triterras and received (through Ikon and Symphonia) consideration of

$60 million in cash and a 61.2% equity stake in Triterras.

55.     After the Business Combination closed, former Netfin shareholders owned the remaining 38.8% of Triterras shares.

## III.    KONERU'S FRAUDULENT CONDUCT IN CONNECTION WITH THE BUSINESS COMBINATION

56.     To secure the approval of Netfin's shareholders of the Business Combination and minimize Netfin shareholder redemptions, Koneru made or approved numerous statements to investors that were, at a minimum, materially misleading.

57.     As set forth in more detail below, Koneru and others acting at his direction or with his approval on behalf of Triterras Fintech communicated a straightforward and consistent message to investors from the announcement of the Business Combination on July 29, 2020, through the closing of the Business Combination (and thereafter): the Kratos platform provided SME traders access to much needed trade financing from lenders; the platform had already established scale in volume and profits from trade and trade finance facilitated by the platform; and the platform had "onboarded" ten lending funds that collectively managed an estimated $17 billion in assets (*i.e.*, the Ten Lending Funds).

58.     These statements created the false impression that the platform's reported Trade Finance module volume and associated revenue was driven by the platform's successful facilitation of financing to SME traders for their commodities trades by the Ten Lending Funds. In reality, only a small percentage of the total reported Trade Finance module volume and associated revenue involved any of these Ten Lending Funds.

59.     Moreover:

- One of the Ten Lending Funds was related party TAPL Fund, which was the only one recorded as having provided financing through at least June 2020;

12

- Four of the Ten Lending Funds were never recorded as having provided any Trade Finance module financing (even through at least February 29, 2021); and

- All of the Trade Finance module financing recorded as attributable to the remaining five of the Ten Lending Funds was financing to Rhodium (in the results period presented to investors prior to the Business Combination) or was financing to Rhodium and Longview (post Business Combination through at least February 29, 2021).

60.     In other words, despite the marketing of Kratos as a solution for the claimed inability of SME traders to obtain trade financing, related parties Rhodium and Longview were the only entities that obtained trade financing from any of the Ten Lending Funds.

61.     Further, much of the lending to related parties Rhodium and Longview was sourced and arranged off-line and only added to the Kratos platform after the fact, at Koneru's direction or with his knowledge, to make it falsely appear to be new Trade Finance module volume.

62.     These facts were not disclosed to investors before or after the Business Combination closed.

**A.     Koneru Made Misleading Statements In Investor Communications**

63.     Koneru personally made misleading and deceptive statements, including during recorded July 29, 2020, August 20, 2020, and October 1, 2020 presentations, and transcripts of these calls were made publicly available to investors.

64.     During these three presentations, Koneru made the following statements regarding the Kratos platform:

- "I identified an opportunity to bring technology to our space in the form of a digital

marketplace to improve and streamline commodity trading and to help traders access much needed trade financing…. Kratos was launched in June 2019 and as end of June 2020 there have been over 3,500 transactions representing over $6.6 Billion of transaction volume conducted on our platform. To date we have onboarded funds that we estimate manage over $17 billion of assets." (7/29/20 and 8/20/20 investor presentation transcripts); and

- "I identified an opportunity to bring technology to our space in the form of a digital marketplace to improve on streamline commodity trading and to help traders access much-needed trade finance…. Kratos was launched in June 2019. And as of the end of August 2020, there have been over 4,500 - 4,800 transactions, representing over $8.8 billion of transaction volume conducted on our platform. To date, we have onboarded funds that we estimate manage over $17 billion of assets." (10/1/20 presentation transcript).

65.     In each of the three investor presentations, Koneru followed his remarks by introducing Triterras Fintech's Executive Vice President in charge of investor relations (the "IR Officer") and turned the presentation over to the IR Officer to "tell … about our story in detail."

66.     The IR Officer had scant expertise in physical commodities trading and trade finance, and he joined Triterras Fintech in this role only as of April 2020 and reported to Koneru.

67.     After being introduced by Koneru, the IR Officer covered the remainder of the investor deck for the applicable presentation.

68.     The decks described the proposed Business Combination and Triterras Fintech's business and prospects and were filed with the SEC by Netfin and/or Triterras as Rule 425 prospectuses.

69.     Koneru participated in the preparation of the investor decks and generally signed off on them, on behalf of Triterras Fintech.  He was also present for the IR Officer's remarks at each of the July 29, 2020, August 20, 2020, and October 1, 2020 presentations.

70.     During at least the July 29, 2020 presentation, the IR Officer read from a script that Koneru had reviewed and edited beforehand.

71.     The August 20, 2020, and October 1, 2020 presentations included a question-and-answer portion after the prepared remarks and investor deck had been covered.  Koneru (who remained on these calls) made additional remarks in response to questions.

72.     For example, during the October 1, 2020, call, Koneru stated in response to a question:

> [W]e developed the Trade Finance module. . . [T]he banks, by this time—this is like almost 2019-2020 February is when we launched the Trade Finance module. We had very few banks – 90% of them have exited.  So we went to our specialist trade finance companies, or funds, or alternate lender lenders who were seeking higher yield.  They were predominantly in US, and some of them in Europe, and a little or few of them in Middle East, and one or two here in Singapore.  So these guys – actually they liked it a lot.  Because unlike banks, these funds don't have a huge back-office of 500 people to do background checks and all that.  And our tool actually provided all the transparency that they need so that they can originate loans.  So we started off in February 2020.  We estimated by February 2021, we will have about eight or nine funds.  But by March-April—by April-May, actually, we had over ten funds on the platform, aggregating about $17 [b]illion of AUM." (10/1/20 investor presentation transcript).

73.     With respect to the August 20, 2020 presentation, Koneru was quoted in a press release dated August 24, 2020, thanking the organizers of the call for providing "a unique forum to demonstrate our execution of this year's business plan ahead of schedule and to provide details around our compelling growth plan."

74.     The press release and transcript of the presentation were furnished as exhibits to a Form 8-K filed with the SEC on August 24, 2020 by Netfin, and Triterras filed a Rule 425

prospectus on the same date containing the 8-K and its exhibits.

75.    During the July 29, 2020, August 20, 2020, and October 1, 2020 presentations, Koneru spoke about a "Company Snapshot" slide in the investor deck, which contained references to "$17B Cumulative Funds Onboarded" and statements that Triterras Fintech is a "[l]eading commodity trade & trade finance digital marketplace," that it has a "[f]irst mover advantage," and that it "delivers previously unavailable access to lenders and borrowers."

76.    For example, the Company Snapshot slide from the October 1, 2020 presentation deck appears as follows:



77.    During the October 1, 2020 presentation, the IR Officer addressed a question about "available lending resources" and referred back to a statement made by Koneru (see paragraph 72 above) that "[w]e have onboarded – and I think Srinivas [Koneru] mentioned this, specifically. The original plan was to onboard eight lenders through the course of this year.  We

16

thought that would provide very adequate resources.  But the guys hit it out of the park.  We onboarded ten lenders that represent $17 billion in AUM.  And we'd like folks to understand that these are not multi-strats [referring to multi-strategy investment portfolios], but these are trade finance lenders as well as general credit funds which have joined the platform.  So the $17 billion in AUM is much more applicable to what is – potentially could be put on the platform."

78.    Referring to the Ten Lending Funds, the IR Officer noted during the October 1, 2020, call "the fact that we've got ten lenders[.]"

79.    The IR Officer claimed during the October 1, 2020 call that the Ten Lending Funds that had purportedly been onboarded to Kratos were more than sufficient to meet projections: "To achieve $2.5 billion – to kind of help the numbers work on that, we feel we need about 50% of that because these loans turn over. They're short-term loans – 150, 180 days. So to achieve $2.5 billion in borrowing, we have to see about $1.25 billion deployed on the platform or looking in the context of fiscal 2021, we would need about $2.8 billion deployed.  So the funds that we've attracted, the lenders we have on the platform we think gives us plenty of runway and dry powder to achieve those results."

80.    Following these statements, Koneru did not offer any corrections or clarifications to any of the IR Officer's representations.

81.    Koneru also participated in numerous conference calls during late July and August 2020 with Netfin shareholders and prospective investors to promote the Business Combination.  During these calls, there were questions about the lenders, and investors were told that there were ten lenders on the platform.

82.    The slides in the investor presentation decks that the IR Officer walked through during the presentations described the traders and lenders as distinct and that the Trade Finance

module addressed SME traders' lack of adequate trade finance access.

83.    For example, with respect to the July 29, 2020 presentation, Koneru reviewed and edited the investor presentation deck, as well as edited the scripted remarks by the IR Officer in advance, and Koneru signed off on the Form 8-K on behalf of Triterras Fintech that included the deck and transcript of remarks in the pre-recorded presentation.  Multiple slides in the July 29, 2020 deck and the IR Officer's remarks described the traders and lenders as distinct and claimed that the Trade Finance module addressed SME treaders' lack of adequate trade finance access, including a slide on "Market Opportunity in Trade Finance" depicted as:

### Market Opportunity in Trade Finance


Cost of administering a $100M loan and a $5M loan is the same -- lenders have ignored sub $10M loans



Traders are under pressure with fewer funding sources



Trade finance is available but significant barriers exist

- Basel III capital requirements have led banks to focus on the largest trading counterparties as capital allocated to trade finance, even if insured, requires high capital reserve ratio
- Traders oftentimes cite that lack of adequate trade finance is their #1 constraint on growth
- COVID-19 has added extra pressure on the segment

- Trade finance generates attractive yields
- Compliance costs a key issue
- Many funds and investors are seeking ways to enter the sector but have no way to source opportunities or validate and diligence counterparties



The World Trade Organization estimates traders face a $1.5 trillion annual shortfall of trade finance availability[1]

1)  Source: WTO.org 7/13/19                                                                    13

84.    The IR Officer's comments while walking through the above slide reinforced these points, stating: "[I]t is a well-accepted fact that there is a significant shortage of available trade finance in the industry for transactions under $10 million.  This situation is primarily driven by the fact that Lender's costs are too high to make smaller sized trade finance loans profitable. Lack of trade finance for traders means that trades don't take place, leading to a direct constraint

on overall international business activity, so it draws lots of attention and concern.  The World Trade Organization estimates that there is a $1.5 trillion shortage every year in trade finance in this smaller-sized loan space, a fact that is highlighted in a number of trade finance media sources.  It is a major problem for some millions of traders, which Triterras Fintech has the solution for through Kratos."

85.    The next slide in the July 29, 2020 deck similarly showed there were three constituencies that the platform served—and "Lenders" were shown as distinct entities from "Operators" and "Borrowers":



86.    Similarly, the IR Officer commented on the above slide: "I would like to turn your attention to the Kratos platform itself which serves 3 core constituencies—1) traders as operators as they conduct their commodity trading activities 2) traders as borrowers of trade finance, and 3) lenders who provide that trade finance.  All of this occurs in one online digital marketplace."

87.     The next slide depicted the business model, which again showed the "Funders Seeking Borrowers" as distinct from "Traders (Commodity Buyers and Sellers)" and "Traders Seeking Trade Finance":



88.     Again, the IR Officer's commentary on above slide reinforced the distinctions and further highlighted the pricing as cheaper than origination fees charged by offline loan brokers: "The Trading Module allows buyers and sellers of commodities to trade with each other online. For trades conducted on the platform, Kratos charges a 30-basis point fee or 0.3% on the volume traded. The Trade Finance module facilitates the availability, sourcing and management of trade finance loans between a lender and a trader online. For trade financing arranged on the platform, we charge 130 basis points or 1.3% of the amount of the financing. It is important to note that this pricing is less than the origination fees charged by offline loan brokers."

89.     Another slide on "Kratos Value and Benefits" similarly showed traders and lenders as different entities and highlighted the key issues for both that the platform addressed:



90.    The IR Officer's comments on the above slide reinforced the above points: "Please refer to the Lenders section on the right hand side of the slide.  Kratos provides a strong complement of benefits to lenders and is attracting a community of them ready, willing, and able to make smaller size loans (sub $10 million, that is) to qualified traders.  The gross yields in the smaller-sized trade finance loans can run 10 to 13%, an attractive yield for many investment funds.  But … the main issue for these funds and the reason for the overall shortages of available trade finance in the marketplace has been the high costs relative to the size of the loan . . . . Kratos simply makes it easier and more profitable for lenders to grow and manage their loan portfolios while meeting the requirements of compliance to international regulations . . . . Kratos is hyper-focused on addressing that $1.5 trillion annual shortfall in trade finance identified by the WTO . . . . . Turning our attention to the traders, first and foremost, the benefit is the increased availability of trade finance on the Kratos platform. Lack of trade finance is often cited by traders as their largest constraint on growth.  This is a problem that Kratos is designed to

address."

91.     Yet another slide explained that "[t]raders attract lenders, which in turn attract more traders/borrowers, thus creating a virtuous cycle" and included a diagram the "3rd Party Lending" on Kratos:



92.     The IR Officer's comments on the above slide reinforced highlighted the onboarded lenders: "[W]e kickstarted the platform with the Rhodium trading business which upfront gave us the required critical mass of traders and transaction volume to run a viable platform.  We then added the Trade Finance module and to date have on-boarded lenders that we estimate have $17 Billion assets under management that are ready, willing and able to provide trade finance to our community of traders.  As evidenced in our growth, we are seeing how traders have attracted new lenders onto the platform.  And those lenders in turn attracted more new traders and have created a virtuous cycle of growth, which we anticipate will continue to accelerate."

93. The July 29, 2020 deck's Summary slide claimed that Triterras Fintech was not an unproven start-up but rather was a "[p]roven business with extraordinary prospects"; a "first mover in the trade and trade finance sector"; and that "Kratos squarely addresses the $1.5 trillion trade finance shortfall by providing new access to both lenders and traders, solving the largest problem cited by many commodity traders."

94. The above slides and the statements made by the IR Officer reinforced the statements made by Koneru and additional statements made in the Proxy Statement (described below), thereby creating the false impression that the reported results of the Trade Finance module were based on the Ten Lending Funds or other third parties providing financing to SME traders—and not SME traders providing credit terms to one another.

**B.    Misleading Statements In the Proxy Statement Attributable To Koneru**

95. As discussed in paragraph 197 below, the Proxy Statement (as defined above) represented that all of the information about Triterras Fintech was provided by Symphonia and Ikon, the two investment entities through which Koneru was the sole indirect owner of Triterras Fintech. In addition, as discussed in paragraphs 192 to 194 below, the Business Combination Agreement, which Koneru signed and which was included as an annex to the Proxy Statement, reflects that Symphonia and Ikon (investment vehicles 100% owned by Koneru) had certain responsibilities with respect to the provision of information about Triterras Fintech and the investor filings made, including with respect to the Proxy Statement, to ensure they did not contain untrue statements of material facts and also did not omit to state any material fact which would be required to be stated in order to make the statements therein not misleading.

96. Koneru reviewed and approved the Form F-4, which included the Proxy Statement.

97.     As a result, all statements relating to Triterras Fintech in the Proxy Statement are attributable to Koneru.

98.     The Proxy Statement included materially misleading statements about the purpose, function, and financial performance of the Trade Finance module.

99.     As described in the Proxy Statement, the Trade Discovery module enabled traders to find counterparties and transactions on the platform, use the KYC and other risk assessment tools, document each step of a trade, and request funds from lenders in the Trade Finance module.

100.    As described in the Proxy Statement, the Trade Finance module was "used by lenders or financial institutions to receive funding requests, to assess the funding opportunity and to provide funding to borrowers," and it supported lenders in setting funding limits and viewing the transaction history of traders.

101.    The Proxy Statement described the Trade Finance module as: "provid[ing] the option for the parties [buyers and sellers] to finance the purchase or sale of the commodities being traded using extended credit terms*, generally through the purchase of receivables*" (emphasis added).  Lenders providing funding to commodities traders typically purchase receivables as collateral for the financing.

102.    The Proxy Statement further described that the Trade Finance module was "used by lenders or financial institutions to receive funding requests, to assess the funding opportunity and to provide funding to borrowers."

103.    And it stated: "The commercial launch of the 'Trade Finance' module occurred in February 2020, and from commercial launch through August 2020 (inclusive), Trade Finance Volume accounted for US$1.1 billion of our US$8.8 billion total transaction volume. As of

August 31, 2020 we had onboarded lender users representing cumulative funds of approximately US$17 billion…."

104.    The Proxy Statement further broke down in a diagram the stages of trade transactions and trade finance transactions, explaining that Kratos "links to the blockchain six times for a trade transaction and an additional six times for a trade finance transaction":



105.    The following disclosures from the Proxy Statement also created the impression that lending on the platform was done by third-party lenders and not the two counterparties to a trade:

- "[Kratos] is one of the world's largest (as measured by total transaction volume) commodity trading and trade finance platforms that connects and enables commodity traders to trade and source capital from lenders directly online."

- "Several "risk factors" regarding lenders are: (a) "As we do not provide trade financing, our ability to facilitate trade financing to Kratos users is entirely dependent on the willingness of lenders and other traders using the 'Trade Finance' module to finance the transactions and provide trade credit"; (b) if Triterras Fintech would be "unable to continue to add . . . additional lenders to provide financing"; and (c) " the participation of third-party financing providers on the Kratos platform may cease at any time."

- "Kratos provides lenders with a community of prequalified trade finance borrowers, with their KYC, AML and financial information uploaded to the platform, giving potential trade finance providers the confidence to transact in this ecosystem."

- "Trade Finance Volume is a function of the availability of funding at competitive rates from our lenders."

106. The Proxy Statement also stated the fee charged to the borrower would be recognized as revenue when funds are disbursed: "Platform service fees are recognised at the point in time when funding was provided to the borrowers on the platform (i.e. lender has disbursed the loan funding to the borrower and the borrower has acknowledged the loan funding on the platform)."

**C.    Koneru's Statements To Investors Were Materially Misleading**

107. Contrary to the above-described statements in investors communications and public filings that described the use, purpose and function of the Trade Finance module as connecting traders seeking financing for their commodities trades with lenders seeking SME trader borrowers, that is not how Kratos's Trade Finance module was principally used.

108. In reality, only approximately 10% of the Trade Finance module volume consisted of financing transactions involving the Ten Lending Funds.

109. The remaining approximately 90% of the reported Trade Finance module volume consisted of ordinary commodities trade transactions between two trader counterparties without sourcing financing from any third party.

110. As a result, this Trade Finance module activity did *not* address the key problems the Trade Finance module was purportedly addressing—the claimed $1.5 trillion trade finance

shortfall for SME traders (as described in paragraphs 84, 90, and 93 above) and the trader's main growth constraint from lack of access to financing (as described in paragraphs 89-90 above).

111.    Instead, this activity involved transactions between two counterparties wherein the seller trader provided credit terms to its counterparty buyer ("trader-to-counterparty credit") such that the buyer's payment to the seller was not immediately due.

112.    In those circumstances, the selling SME trader used its own capital (or sourced its own financing off-platform) to cover any timing gap it had between when the trade was executed and when payment was later due from its counterparty buyer.

113.    Accordingly, the Trading Finance module's use by traders to extend credit to their counterparty buyers was not an innovative or disruptive solution to the claimed funding gap in the commodities trading markets, as Kratos was marketed to investors.

114.    Furthermore, from inception of the Trade Finance module in February 2020 through August 2020, nearly 40% of the total reported Trade Finance module volume involved Rhodium as the selling trader that was providing credit terms to its own counterparty buyer.  The dependance of the Trade Finance module volume on an entity majority owned by Koneru was not disclosed to investors, and this was not reflected in the related party disclosures that were made in public filings.

### 1.    Related Parties Provided All the Purported Lending in the Trade Finance Module for the Fiscal Year Ended February 29, 2020

115.    The Trade Finance module began operating in February 2020, and Triterras Fintech claimed that for that month there was Trade Finance volume of $186 million and $2.5 million in associated recognized revenue.  These results were also incorporated by reference into Triterras's Form 20-F for the fiscal year ended February 29, 2020 that was signed by Koneru and filed on November 16, 2020.

116.    These disclosures omitted the material information that, as set forth in the table below, all of the reported Trade Finance module volume for the fiscal year ended February 29, 2020 involved lending by the TAPL Fund, a related party fund owned by Koneru, or trader-to-counterparty credit extensions by Rhodium, another related party, to its own counterparty buyer on trade transactions:

| Undisclosed Specifics of Trade Finance Module Recorded Activity (Fiscal Year ended 2/29/2020) | Volume | Percent of Total |
|---|---|---|
| Rhodium as trader in trader-to-counterparty credit | $152 million | 82 % |
| TAPL Fund providing financing to traders | $34 million | 18 % |
| **Total Reported Trade Finance Activity for YE 2/29/2020** | **$186 million** | **100%** |

117.    At the time of these statements, Koneru knew or recklessly disregarded that the composition of the Trade Finance module volume, including that most of the volume consisted of trader-to-counterparty credit extensions by Rhodium to its own counterparty and the rest was lending by TAPL Fund.

118.    For example, Koneru received weekly updates on the status of lending funds for the Kratos platform and, on February 26, 2020 (three days prior to the end of the fiscal year), sent Netfin an email saying that they had "onboarded" six funds plus TAPL Fund and included a table that showed six funds as "signed up" but without signed service agreements.

119.    Two days later, on February 28, 2020, Koneru responded to various questions from Netfin, including by stating that Kratos was on track to have trade financing of $180 million by the end of the day.  But even as late as April 2020, the weekly updates that Koneru received showed that only TAPL Fund had a signed service agreement.

120.    Other communications show Koneru's awareness of the makeup of Trade Finance module lending transactions.  On July 19, 2020, Koneru received an email from a Triterras Fintech employee who was responding to due diligence request from Netfin's investment banker

for a list of all trades facilitated on the platform since inception with trade, trader name and lender name, transaction size, and fee generated.

121.    The employee's email to Koneru attached a spreadsheet with "all the transaction details from June 19 – Feb 20" and noted that the "only challenge is Lenders name, as most of the lending is between counterparts giving credit extension." The attached spreadsheet listed the transaction details in separate tabs for both "Trading Transactions" (from the Trade Discovery module) and "Trade Finance" transactions (from the Trade Finance module).

122.    The Trade Finance tab showed 13 transactions that listed TAPL Fund as the lender with the type as "TF-ARP" and listed separate parties as the borrower and buyer. TF-ARP likely referred to Trade Finance-Accounts Receivable Purchase. The remaining 95 transactions listed a Rhodium entity as lender with the type as "Credit Extension" and one of several entities as borrowers, with no buyer listed. The unique Kratos trade identifier for these Trade Finance transactions listed in this spreadsheet confirms that they match Trade Transactions on the same date between the Rhodium entity (as seller in the trade) and the same borrower entity (as buyer in the trade) with an identical transaction value.

123.    Responding to the "challenge" of providing transaction data with the lender names, Koneru told the consultant that "we are not going to reveal the names of the Buyer/Seller/Lender."

124.    In addition to misrepresenting the nature of the bulk of Trade Finance module activity as third-party lender financing when it was not, the disclosures that were made about related party activity severely understated the extent of that activity in a materially misleading manner.

125.    The Proxy Statement asserted that Koneru related party entities (which would be

Rhodium and the TAPL Fund) "accounted for 26.7% of our revenue for the year ended February 29, 2020, primarily relating to platform fees where Rhodium initiated the commodity trade with its counterparty."  Not only did this not reveal that 100% of the reported Trade Finance module volume and associated revenue was from purported lending by related parties TAPL Fund (which Koneru counted as one of the Ten Lending Funds) or Rhodium (in trader-to-counterparty credit extensions), this 26.7% figure excluded virtually all of the revenue from these Trade Finance module transactions because the 26.7% figure included only revenue from fees *directly charged to* Rhodium or TAPL Fund, and the Trade Finance module fee is charged to the borrower. The 26.7% figure similarly excluded revenue from Trade Discovery module transactions in which Rhodium's counterparty to the trade transaction was charged all or part of the Trade Discovery module fee, which could either be charged to only one counterparty or split between both at the election of the counterparties to the trade.

126.    When all revenue from Trade Discovery module and Trade Finance module transactions in which Rhodium or TAPL Fund was a counterparty is included, the percentage of revenue generated from Rhodium and TAPL Fund's transactions on the platform in the aggregate would have been approximately 70% as opposed to only 26.7%, nearly three times the amount reported.

### 2. Undisclosed To Investors, Only around 10% of Reported Trade Finance Module Volume through August 2020 Consisted of Trade Finance module transactions involving the Ten Lending Funds

127.    The October 1, 2020 presentation deck showcased Trade Finance module volume of $877 million and revenue of $11.4 million (1.3% of $877 million) for the six-month period ended August 31, 2020, with total revenue from both modules of approximately $23.7 million.

128.    The Proxy Statement similarly represented Trade Finance module volume of

approximately $1.1 billion for the seven-month period of inception (February 2020) through August 2020.

129.    In addition, Triterras Fintech issued a press released on September 30, 2020 with high level financial results for the six months ended August 31, 2020 in which Koneru was quoted as saying "[o]ur traction in the marketplace is building each month given Kratos marketplace's first-mover advantage in a physical trade and trade finance industry ripe for disruption."

130.    Yet only approximately 10% of the Trade Finance module volume involved recorded financing transactions involving the Ten Lending Funds—and virtually all the financing was to Rhodium.

131.    The other 90% of the reported Trade Finance module volume consisted of purported trader-to-counterparty credit extensions, and Rhodium's credit extensions to its own counterparty buyers on trades made up more than 30% of the total Trade Finance module volume during this period.

132.    As set forth in the table below, none of this was disclosed to investors:

| Undisclosed Specifics of Trade Finance Module Recorded Activity (March – August 2020) | Approx. Volume | Percent of Total |
|---|---|---|
| Traders other than Rhodium extending trader-to-counterparty credit | $534 million | 60.8% |
| Rhodium as trader extending trader-to-counterparty credit | $267 million | 30.4% |
| Lending Funds providing financing to Rhodium | $74 million | 8.5% |
| TAPL Fund providing financing to traders | $2 million | 0.3% |
| **Total Reported Trade Finance Activity (March – August 2020)** | **$877 million** | **100.0%** |

133.    The October 1, 2020 investor presentation also reported a "monthly run rate" based on the blended monthly average for July and August 2020 of $260 million in Trade Finance module volume, which was used to support the company's projections for more than $2.5 billion in expected Trade Finance module volume for the fiscal year ended February 28,

2021, in which nearly 60% of the projected total revenues would be attributable to the Trade Finance module.

134.    In fact, only about 15% of the Trade Finance module volume run rate for July and August 2020 involved lender-to-trader financing, all of which was to Rhodium as the trader.

135.    As Koneru knew, or recklessly disregarded, the statements made regarding the Trade Finance module and the financial results for it through August 2020, including the run rate, were materially misleading given the omission of the information described in paragraphs 130-132 and paragraph 134 above.

136.    At the time of these statements, in addition to Koneru's awareness of the facts described in paragraphs 117-123 above, Koneru also knew or recklessly disregarded that the Ten Lending Funds other than the TAPL Fund had been slow to complete the steps required to use the Kratos platform, and that little, if any, progress had been made with them to use the Trade Finance module to source, assess, and finance SME traders' commodities trades because he received email updates on lender onboarding and status of activity.

137.    Furthermore, as discussed in Section III.D (paragraphs 141-154) below, Koneru knew or recklessly disregarded that a significant portion of the financing that was put on the platform through August 2020 was historical trade financing to Rhodium from certain of the Ten Lending Funds and had been added to the platform at his direction or with his knowledge as though it was new financing sourced and completed at the time of its addition to the platform in July or August 2020.

138.    In addition to the misleading statements that omitted the true nature of the bulk of Trade Finance module activity, the disclosures that were in the Proxy Statement about related party activity during the six months ended August 31, 2020 severely understated the extent of

that activity in materially misleading manner.

139.    The Proxy Statement stated that the expectation based on currently available information was that Koneru's related party entities (which included Rhodium and TAPL Fund) "will have accounted for 15.5% of our revenue" during this six-month period.

140.    In fact, when all revenue from Trade Discovery module and Trade Finance module transactions in which Rhodium or TAPL Fund was a counterparty is included, the actual percentage of revenue generated from Rhodium's and TAPL Fund's transactions on the platform in the aggregate would have been approximately 42% as opposed to only 15.5%.

**D.    Koneru Directed That Off-Platform Loans be Added to Kratos as New Activity**

141.    As described in paragraph 136 above, Koneru knew or recklessly disregarded that numerous of the Ten Lending Funds had not used the Kratos platform's Trade Finance module to source and assess funding opportunities submitted on the platform by SME traders for their commodities trades.

142.    To make it falsely appear as if the Ten Lending Funds were successfully using the Trade Finance module, Triterras Fintech employees—at Koneru's direction or with his knowledge—added historical financing obtained by Rhodium from several of the Ten Lending Funds to the Kratos platform even though the financing had been arranged and disbursed without use of the platform.

143.    For example, one of the Ten Lending Funds ("Lender A") had a loan facility agreement in place with Rhodium since prior to the June 2019 launch of the Kratos platform. Koneru was directly involved in having trade financing from Lender A added to the Kratos platform even though the financing had been arranged, approved, and disbursed by Lender A previously.

144.    Koneru emailed Lender A on July 28, 2020 to ask that Lender A use Kratos to "approve the trades that have already been disbursed."  Koneru added: "It will help us tremendously. One of my team members will walk your person through and it will take 15 minutes for all trades done since March 2020."

145.    Koneru then received a series of emails in early August 2020 that updated him on the historical Lender A financing transactions being added to the Trade Finance module, and Koneru was also informed by the emails that a Triterras Fintech employee instructed another to finish approving the transactions on behalf of Lender A without waiting for Lender A to approve.

146.    A total of approximately $65 million in trade financing to Rhodium from Lender A was recorded on the Kratos platform as though it were August or September 2020 trade financing even though documents from Lender A show that the last financing disbursement from Lender A to Rhodium was in late July 2020.

147.    As Koneru knew, or recklessly disregarded, Lender A never signed a Kratos service agreement, never approved any loans on the Kratos platform, and never used the platform to connect with SME traders seeking financing for their commodities trades.

148.    Similarly, Koneru sent emails on August 21, 2020, requesting that both Rhodium and Longview share trade related and financing documents for commodities trades that had already been financed by Lender B, so that trade transactions and trade financing from Lender B could be added to the Kratos platform after the fact.

149.    This resulted in approximately $50 million or more of historical financing from Lender B to Rhodium being added to the Trade Finance module as September 2020 financing even though the dates Lender B disbursed financing to Rhodium occurred from January through July 2020.

150.    Similarly, with respect to Longview, this resulted in at least $15 million of historical financing from Lender B being added in the Trade Finance module as September or October 2020 financing even though Lender B had purchased the receivables from Longview by no later than March 2020 from trades that occurred in January and February 2020.

151.    Koneru knowingly or recklessly caused these additions to the Trade Finance module of historical financing by Lender B to Rhodium and Longview.

152.    As another example, on July 6, 2020, a Triterras Fintech employee reported to Koneru that Lender C had completed the Kratos sign up process and noted that Lender C had financed 6 trades between February and May 2020.  Koneru replied: "Get those 6 trades from the past on Kratos." Two of the Lender C historical financing transactions were added to the Trade Finance module as though they were August 2020 financing.

153.    As Koneru knew, or recklessly disregarded, this conduct falsely inflated the Trade Finance module volume reported to investors because these loans had not been sourced or arranged through use of the Kratos platform and instead were off-platform financing between the lenders and Rhodium or Longview.

154.    As Koneru also knew or recklessly disregarded, this conduct misleadingly inflated the Trade Finance module volume for the months in which they were added.

## IV.    KONERU CONTINUED TO DEFRAUD INVESTORS FOLLOWING THE BUSINESS COMBINATION

155.    Seeking to prevent Triterras's stock price from plummeting, Koneru continued knowingly or recklessly to make materially misleading statements about Triterras after the Business Combination in November 2020.

### A.  December 2020 Press Release, Investor Call, and Form 6-K

156.    On December 17, 2020, in a Form 6-K signed by Koneru, Triterras disclosed that

a Rhodium creditor had filed a "statutory demand for payment" and that Rhodium was required to respond within 21 days "or a bankruptcy application could be filed by the creditor against Rhodium."

157.    The Form 6-K further disclosed: "Rhodium has informed [Triterras] that its traditional commodity trading business has been adversely impacted by the COVID-19 pandemic and the lack of availability of trade finance funding for commodity trades involving SMEs. Rhodium has informed [Triterras] that today . . . it has sought a moratorium order from a Singapore court which will shield Rhodium from creditor actions while Rhodium prepares . . . to restructure its debts and continue its business as a going concern."

158.    Triterras's stock price dropped from over $13 per share to below $8 per share following this disclosure.

159.    On December 22, 2020, Triterras issued a press release and held an investor call. A Form 6-K signed by Koneru was later filed on December 28, 2020 that furnished the press release and a transcript of the investor call.

160.    The press release quoted Koneru as saying, "[o]ur business update will reiterate our previous fiscal year outlook" for the fiscal year ended February 28, 2021, and Triterras's "estimated Q3 net income and revenue remain on track."

161.    On the investor call, Koneru stated that "[o]ur Kratos platform continues to gain commercial traction with SME community of traders and lenders" and that "[w]e have experienced significant increase in other traders that use the platform, as well as users of the trade finance business module."

162.    Triterras's IR Officer stated on the call that Trade Finance module volume was $878 million in the third quarter (the quarter ended November 30, 2020) alone. He then

36

highlighted that this Q3 amount equaled the total amount of Trade Finance module volume from the first half of the fiscal year combined and that Trade Finance module fees are "the most profitable revenue stream we have."

163.    However, neither Koneru nor anyone else on the call, including the IR Officer, revealed that, of the $878 million in reported Q3 Trade Finance module volume and associated revenue, more than 85% consisted of trader-to-counterparty credit extensions.

164.    Less than 15% of the Q3 Trade Finance volume involved financing by any of the Ten Lending Funds and all of that financing was to Rhodium or Longview (related parties to Triterras).  Moreover, some of that financing to Rhodium or Longview were the post hoc additions of financing transactions described in paragraphs 143 to 151 above.

165.    Koneru knew or recklessly disregarded that the reported Q3 Trade Finance volume consisted overwhelmingly of trader-to-counterparty credit extensions.

166.    In addition to the information he previously received, as summarized in paragraph 136 above, a December 11, 2020 spreadsheet report provided him with a detailed breakdown of activity during the previous three quarters with the trade financing by any of the Ten Lending Funds shown in a separate tab labeled "TF" and the trader-to-counterparty credit extensions shown in a tab labeled "CE."  Among other things, the information in the spreadsheet showed the following:

|  | Credit Extension Tab Approx. Volume | Trade Finance Tab Approx. Volume | Trade Finance Tab Activity Reflected |
|---|---|---|---|
| Q1 | $267.3 million | $2.3 million | 100% TAPL Fund providing financing to two traders |
| Q2 | $533.2 million | $74.5 million | 100% Lending Funds providing financing to Rhodium |
| Q3 | $754.6 million | $119.9 million | 100% Lending Funds providing financing to Rhodium or Longview |

**B. Triterras's Form 20-F for FY Ended February 28, 2021**

167.    Koneru signed and certified Triterras's delinquent Form 20-F for the fiscal year ended February 28, 2021, which was not filed until March 7, 2022.

168.    In the Form 20-F, Triterras reported information that could be used to calculate Trade Finance module volume of $2.54 billion, which with a 130 bps fee applied equates to associated revenue of more than $33 million for the fiscal year ended February 28, 2021.

169.    But this Form 20-F, like other filings before it, omitted critical information about these figures and thereby created the misleading impression that these figures reflected financing by the Ten Lending Funds to SME traders.

170.    For example, the Form 20-F's subsection on the Trade Finance module described it as being used by "lenders or financial institutions to receive funding requests, to access the funding opportunity, and to provide funding to borrowers" and stated "[f]or the fiscal year ended February 28, 2021, we had onboarded lender users representing cumulative funds of $17 billion."

171.    These statements were substantially similar to the disclosures in the Proxy Statement about the Trade Finance module.

172.    Yet less than 10% of the Trade Finance module volume for the fiscal year ended February 28, 2021 involved financing by the Ten Lending Funds, and all of this activity was financing to related party entities Rhodium or Longview, with the exception of a small amount of financing provided by related party TAPL Fund.

173.    As with prior periods, the overwhelming majority of Trade Finance module volume for the fiscal year ended February 28, 2021 consisted of trader-to-counterparty credit extensions.

## V.     KONERU'S MISREPRESENTATIONS AND OMSSIONS WERE MATERIAL

174.     Kratos's Trade Finance module was key to Triterras Fintech's business and future projected growth.

175.     The Trade Finance module was pitched as addressing a claimed $1.5 trillion annual shortfall in trade finance funding for SME traders by connecting SME traders and lenders with each other on a platform system that reduced administrative and due diligence costs of trade finance for lenders, which makes smaller loans economically viable for lenders, while providing SME traders access to trade financing.

176.     As set out in the Proxy Statement, the company's key operating metrics were Trade Discovery module volume, Trade Finance module volume, the ratio of the two, and the transaction fees charged for both modules.

177.     The reported current fees for the Trade Finance module (130 bps) were more than four times the amount of the reported fees for the Trade Discovery module (30 bps).

178.     The projections in the Proxy Statement included the assumption that Trade Finance module volume would be approximately 33% of the Trade Discovery module transaction volume.

179.     Because Trade Finance module fees were reportedly 130 bps in addition to the 30 bps Trade Discovery module fees for the transaction, Trade Finance module revenue constituted nearly 50% of the revenue reported for the six months ended August 31, 2020 and was projected to be nearly 60% total revenue for the fiscal year ended February 29, 2021 and thereafter.

180.     The fact that only a very small percentage of the reported Trade Finance module volume was from the Ten Lending Funds (or any other third-party lender) would have been important to investors because trader-to-counterparty credit extensions do not align with the key

touted benefit of the platform of solving the purported $1.5 trillion trade finance gap for SME traders.

181.    The understanding that Kratos's Trade Finance module volume was driven by the Ten Lending Funds with $17 billion in AUM was also important to analysts' evaluation of Triterras Fintech and Triterras.

182.    For example, an analyst who participated in the October 1, 2020 analyst call issued a report on October 7, 2020 with an "outperform" rating and a price target of $18 per share (the then-current Netfin stock price was $10.45 per share).

183.    The analyst's report highlighted the point made by Koneru and the IR Officer on the call regarding the vast resources being deployed by lenders on the platform.  The report stated:

> Kratos has 10 lenders onboarded that run ~$17B in assets with more on lenders on the way. Currently, the 10 onboarded lenders allow for Triterras to easily achieve 2020 guidance numbers as only $1B in assets under management would be needed but Kratos has lenders with $17B….To reach 2021 numbers, management noted only $2B is needed, and to reach 2022 numbers, $4B is needed which is more than covered by the current AUM from the 10 on boarded lenders.

## VI.    KONERU HAD ULTIMATE AUTHORITY OVER REPRESENTATIONS IN THE PROXY STATEMENT AND MATERIALS PROVIDED TO INVESTORS

184.    As a result of his role as the founder, CEO, sole director, and sole indirect owner of Triterras Fintech, Koneru was responsible for and had ultimate authority over statements in the Form F-4 about Triterras Fintech, which included the Proxy Statement, as well as the other filings made in connection with the Business Combination, including those made under Rule 425.

185.    Koneru expressly approved the filing of the final Form F-4 amendment, amendment 3 filed on October 26, 2020.

186.     Specifically, in response to an October 26, 2020 email requesting "sign-off" on the final Form F-4, Koneru responded, "We are good to file."

187.     Prior to authorizing the filing of the Form F-4 and amendments thereto, Koneru reviewed and commented on it.

188.     For example, in an email dated August 3, 2020, Koneru told Netfin's CEO and other senior officials, including Triterras Fintech's IR Officer, that they should not spend time on the Form F-4's business section because Koneru and a colleague were "going over and making changes [to the Form F-4.  It needs a lot of changes from the previous version and I think we will be better off doing it.  If there are any specific points that you want us to consider send us the bullet point list and we will try to accommodate those, if we havent [sic] already done so."

189.     In that same email, Koneru stated that "[w]e have to give the F4 to [the Auditor] latest by Thursday night[.]"

190.     An email dated August 4, 2020 shows that Koneru specifically reviewed the representation that Kratos Lenders have "17B of available AUMs" and that these lenders only need to deploy $1 billion for Triterras to reach its annual target.

191.     Koneru's exercise of ultimate authority over the statements in the Form F-4 about Triterras Fintech, including the Proxy Statement, is consistent with the requirements imposed on him under the Business Combination Agreement, which was included as an Annex to the F-4 and Proxy Statement.

192.     Specifically, Business Combination Agreement (§ 5.27) required Ikon and Symphonia (referred to as "the Stockholders") or by Triterras Fintech (referred to as  the "Target Company") to ensure that "[n]one of the information supplied" by them or by Triterras Fintech in writing expressly for inclusion or incorporation by reference in: (a) any SEC filing; (b) the

Form F-4 or the Proxy Statement/Prospectus; or (c) any mailing sent to Netfin shareholders "will, when filed, made available, mailed or distributed, as the case may be, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading," except for forward looking statements. It also required, among other things, that "[n]one of the information supplied in writing by the Stockholders or the Target Company expressly for inclusion or incorporation by reference in [] the Signing Press Release [and] the Signing Filing … when filed or distributed, as applicable, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading," except for forward looking statements.

193.    The Business Combination Agreement (§ 8.9(b)) required "the Stockholders"– defined as Koneru-owned entities Ikon and Symphonia–to ensure that the information provided for inclusion in the Form F-4 and the Proxy Statement/Prospectus "[does not] contain any untrue statement of material fact, or omit to state a material fact required to be stated therein not false or misleading at the time and in light of the circumstances under which such statement is made."

194.    The Business Combination Agreement (§ 8.9(c)) also required Netfin, prior to the filing the Form F-4, and any amendment thereto, to give Ikon and Symphonia (referred to as "the Stockholders") "a reasonable opportunity to review and comment."

195.    Koneru was the sole signatory of the Business Combination Agreement, on behalf of Ikon and Symphonia, the 100% owners of Triterras Fintech.

196.    The F-4 itself also reflected Koneru's ultimate authority over statements regarding Triterras Fintech contained therein, including in the Proxy Statement.

197.    For example, the Form F-4 (at 167) stated: "[a]ll information contained in this document . . . . relating to the Sellers and [Triterras] Fintech has been supplied by the Sellers." The term "Sellers" is defined in the Form F-4 to mean Ikon and Symphonia, the entities through which Koneru owned Triterras Fintech.

198.    On August 28, 2020, Koneru signed a "Consent of Director Nominee" in which he consented to being named in the Form F-4 "and any amendments or supplements thereto, including the prospectus contained therein, as an individual to become a director of Triterras, Inc., to all references to me in such Registration Statement and to the filing of this consent as an exhibit to such Registration Statement and any amendment or supplement thereto."

199.    Koneru was part of a small group of Triterras Fintech personnel who developed and reviewed the investor presentation decks.  Koneru also generally signed off on the decks before use.

200.    Koneru also had ultimate authority over the statements in Triterras's public filings discussed herein.

201.    Specifically, Koneru was the sole signer of Triterras's Form 20-F for the fiscal year ended February 29, 2020 (filed November 16, 2020); Form 6-K filed December 28, 2020; and Form 20-F for the fiscal year ended February 28, 2021 (filed March 7, 2022).  The Form 20-F for the fiscal year ended February 29, 2020 expressly incorporated by reference the disclosures about Triterras Fintech's business and results in the Form F-4, as amended, described above.

### FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)

202.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 201.

203.    Koneru, directly or indirectly, singly or in concert, in the offer or sale of securities

and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

204.    By reason of the foregoing, Koneru, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

205.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 201.

206.    Koneru, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

207.     By reason of the foregoing, Koneru, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendant and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### II.

Ordering Defendant to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

### III.

Ordering Defendant to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### IV.

Prohibiting Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

## V.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.

Dated:  New York, New York
        November 7, 2025

                            /s/ David Stoelting
                            Sheldon L. Pollock
                            Wendy B. Tepperman
                            David Stoelting
                            Amy Mayer
                            Kevin Oswoski
                            Attorneys for Plaintiff
                            SECURITIES AND EXCHANGE COMMISSION
                            New York Regional Office
                            100 Pearl Street
                            Suite 20-100
                            New York, NY 10004-2616
                            212-336-0174 (Stoelting)
                            StoeltingD@sec.gov