USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/19/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-v-

SRINIVAS KONERU,

Defendant.

25-cv-9327 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendant Srinivas Koneru ("Defendant" or "Koneru") moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint filed against him by the Securities and Exchange Commission ("SEC"). Dkt. No. 25. For the reasons set forth below, the motion to dismiss is denied.

**BACKGROUND**

The SEC brings this civil enforcement action against Koneru for his alleged involvement in a purportedly fraudulent investment scheme related to the November 2020 business combination ("Business Combination") of his private company, Triterras Fintech Pte. Ltd ("Triterras Fintech"), with Netfin Acquisition Corp. ("Netfin"), a special purpose acquisition company ("SPAC"). Dkt. No. 1 ("Compl.") ¶ 1. For the purposes of this motion, the Court accepts as true the well-pleaded allegations of the SEC's complaint as supplemented by the documents incorporated by reference, such as SEC filings. *See Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (summary order).

## I. Defendant & Relevant Entities

Koneru is a United States citizen who resided in Singapore during 2020 and 2021 and currently lives in Dubai. Compl. ¶ 18. In 2012, Koneru co-founded Rhodium, a Singapore-based commodities trading business, of which he retains majority ownership and control.[1] *Id.* ¶ 22. In 2018, he founded Triterras Fintech (originally known as Arkratos Blockchain Solutions Pte. Ltd.). *Id.* ¶ 20. Triterras Fintech was owned in full by Koneru through two holding companies: IKON Strategic Holdings Fund ("Ikon") and Symphonia Strategic Opportunities Limited ("Symphonia"). *Id.* Koneru also founded and indirectly owned TAPL Fund, a trade-finance fund based in the Cayman Islands. *Id.* ¶ 23.

Netfin was a Cayman Islands exempt company with its principal office in New York, New York. *Id.* ¶ 19. Netfin had its initial public offering ("IPO") on August 2, 2019 at $10 per share. *Id.* ¶¶ 19, 36, 38. Through the Business Combination, Netfin acquired Triterras Fintech on November 10, 2020, to form the new public company, Triterras. *Id.* ¶ 19. Upon the closing of the Business Combination, Koneru became Triterra's CEO and Executive Chairman while maintaining a controlling equity stake in the enterprise. *Id.* ¶ 21.

Triterras issued shares and warrants to Netfin security holders, which traded under the Nasdaq tickers "TRIT" and "TRITW," respectively. *Id.* In 2022, Nasdaq delisted Triterras, and the securities were subsequently quoted on the OTC Expert Market. *Id.* In 2025, the TRIRF Acquisition Corp., a company owned and controlled by Koneru and Netfin's former CEO, acquired the public securities for Triterras at the price of $0.10 per share. *Id.*

[1] In December 2020, Rhodium was renamed Antanium Resources Pte. Ltd. Compl. ¶ 22. The company has direct and indirect subsidiaries that trade commodities in other countries. *Id.*

## II. Launch of the Commodities Trading Platform

Triterras Fintech's principal asset was a blockchain-enabled online platform called "Kratos" that served small- and medium-enterprise ("SME") physical commodities traders ("SME traders").[2] *Id.* ¶ 2. Ordinarily, SME traders act as intermediaries between sellers and cross-border buyers of commodities. *Id.* ¶ 27. Traders pay the seller at or before shipment, but traders do not collect payment from the buyer until delivery or shortly thereafter, resulting in a credit risk and a lag of 120 to 150 days between purchase and payment. *Id.* ¶ 28. During that gap, traders fund payments to sellers by using their own cash, a letter of credit, or by borrowing funds. *Id.* Physical commodity trading by SME traders had not yet been facilitated by a widely adopted digital marketplace. *See id.* ¶ 29, 64. With a platform that not only connected traders with one another but also connected traders to lenders for wider access to trade financing—thereby increasing the size of the trading market, speeding up trading frequency, and providing much-needed liquidity—Kratos sought to solve a significant inefficiency and capture a sizable opportunity across the globe. *See id.* ¶ 64.

In service of that vision, Kratos consisted of two modules. With its "Trade Discovery" module, launched in June 2019, Kratos connected traders with one another so that they could conduct trades more efficiently. *Id.* ¶¶ 2, 31, 99. And through its "Trade Finance" module, launched in February 2020, Kratos provided traders with access to trade financing opportunities through connections with lenders that may provide funds to enable the online transactions. *Id.* ¶¶ 2, 32. Kratos's blockchain infrastructure provided traders with tracking and auditing capabilities intended to help international SME traders transition away from offline paper-based trades and trade finance of physical commodities. *Id.* ¶ 25. To earn revenue, Triterras Fintech

---

[2] Examples of physical commodities include grains and oil seeds. Compl. ¶ 27.

charged a fee of thirty basis points ("bps," representing one-hundredth of a percentage point) on its Trade Discovery module based on the transaction volume of an executed physical commodity trade on Kratos. *Id.* ¶ 33. For the Trade Finance module, Triterras Fintech charged an additional financing source fee of 130 bps to the borrower on the amount being financed (*i.e.*, 1.3% of the loan amount). *Id.* ¶¶ 33–34.

## III. Business Combination

Koneru sought to take Triterras Fintech public through a merger with Netfin in late 2020. *See id.* ¶¶ 6–9, 41–43. As a SPAC without any operating business, Netfin completed its IPO at a price of $10 per share and deposited $253 million of proceeds into a trust account so that it could evaluate and execute a business combination. *Id.* ¶¶ 36, 38. Three days after Netfin's IPO on August 2, 2019, Netfin's then-CEO spoke with Koneru about a potential business combination involving Rhodium and Triterras Fintech. *Id.* ¶ 39. Koneru and Netfin's CEO were acquainted through prior business affiliations: Longview Resources Group ("Longview"), a commodity trading group based in Hong Kong founded in 2016 by Netfin's CEO, was a customer of Triterras Fintech. *Id.* ¶ 40. Conversations continued through late 2019. *Id.* ¶ 41.

On June 29, 2020, Netfin filed a Form 8-K announcing a non-binding letter of intent to acquire Rhodium and Triterras. *Id.* ¶ 42. Shortly thereafter, the transaction was revised such that Netfin would combine only with Triterras Fintech, which would become the operating company of the combined public entity. *Id.* ¶ 43. On July 29, 2020, Netfin filed another Form 8-K and a Rule 425 prospectus announcing that it had entered into a business combination agreement (the "Business Combination Agreement") wherein all issued and outstanding shares of Triterras Fintech would be acquired by a holding company; Netfin and Triterras Fintech would both be subsidiaries of the holding company; the issued and outstanding Netfin securities would be exchanged for securities in the holding company; and the holding company would be renamed

"Triterras" upon consummation. *Id.* ¶ 44. The Business Combination Agreement was signed by Koneru on behalf of Ikon and Symphonia, the co-owners of Triterras Fintech. *Id.* ¶ 47.

From August 2020 onwards, Koneru participated in drafting and approving Netfin's definitive proxy statement / prospectus filed on October 29, 2020 (the "Proxy Statement," Dkt. No. 27-1) and the Form F-4 registration statement filed by Triterras (under the company name "Netfin Holdco") on August 28, 2020, as amended, and declared effective by the SEC on October 29, 2020. *Id.* ¶¶ 31, 48–49. Koneru also participated in roadshows and investor calls to persuade Netfin shareholders to approve the proposed transaction. *Id.* ¶ 48.

Shareholders of Netfin were given until 5:00 p.m. on November 6, 2020, to exercise their redemption rights at a price slightly above $10 per share. *Id.* ¶¶ 8, 50. On November 10, 2020, less than 3% of Netfin's public shares were submitted for redemption and the shareholders overwhelmingly approved the Business Combination. *Id.* ¶ 8. Triterras filed a Form 8-A for registration of its ordinary shares and warrants pursuant to Section 12(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). *Id.* ¶ 52. Those shares and warrants began trading on Nasdaq on November 11, 2020. *Id.* ¶ 53. Pursuant to the Business Combination Agreement, in addition to becoming CEO and Executive Chairman, Koneru received a 61.2% equity stake in Triterras and $60 million in cash consideration; the prior Netfin shareholders retained the remaining 38.8% of the Triterras shares. *Id.* ¶¶ 54–55.

### A. Statements Made Ahead of Shareholder Approval

From July 29, 2020—the announcement of the Business Combination—to November 10, 2020, Koneru (or others acting at his direction) made a series of representations regarding Triterras Fintech and Kratos to the shareholders of Netfin and the public. *Id.* ¶¶ 51, 57. As the Court details below, the core representations were that the Kratos platform provided SME traders with much-needed trade financing from lenders, that the platform had already established scale

in volume and profits from the trades and financing facilitated by the Trade Discovery and Trade Finance modules, and that the platform had "onboarded" ten lending funds that collectively managed an estimated $17 billion in assets (the "Ten Lending Funds"). *Id.* ¶ 57. These representations were made in investor presentations and calls as well as in the Proxy Statement and are the bases for the SEC's present lawsuit.

### 1. Representations in Investor Presentations and Calls

In three recorded presentations dated July 29, August 20, and October 1, 2020, Koneru made the following similar statements regarding Kratos:

- July 29 and August 20: "I identified an opportunity to bring technology to our space in the form of a digital marketplace to improve and streamline commodity trading and to help traders access much needed trade financing. . . . Kratos was launched in June 2019 and as [of the] end of June 2020 there have been over 3,500 transactions representing over $6.6 [b]illion of transaction volume conducted on our platform. To date we have onboarded funds that we estimate manage over $17 billion of assets." *Id.* ¶ 64.

- October 1: "I identified an opportunity to bring technology to our space in the form of a digital marketplace to improve [and] streamline commodity trading and to help traders access much needed trade finance. . . . Kratos was launched in June 2019. And as of the end of August 2020, there have been over 4,500–4,800 transactions, representing over $8.8 billion of transaction volume conducted on our platform. To date we have onboarded funds that we estimate manage over $17 billion of assets." *Id.*.

Following his remarks at each of the presentations, Koneru introduced Triterras Fintech's Executive Vice President of Investor Relations (the "IR Officer"), who provided further details and, at least for the July 29 presentation, read from a script that Koneru had reviewed and edited beforehand. *Id.* ¶¶ 65–70. Koneru then would take questions. *Id.* ¶ 71. For instance, in response to a question during the October 1 investor call, Koneru said the following about the Trade Finance module:

> [W]e developed the Trade Finance module. . . . [T]he banks, by this time—this is like almost 2019-2020 February is when we launched the Trade Finance module. We had very few banks – 90% of them have exited. So we went to our specialist trade finance companies, or funds, or alternate lender lenders who were seeking higher yield. They were predominantly in US, and some of them in Europe, and a

> little or few of them in Middle East, and one or two here in Singapore. So these guys—actually they liked it a lot. Because unlike banks, these funds don't have a huge back-office of 500 people to do background checks and all that. And our tool actually provided all the transparency that they need so that they can originate loans. So we started off in February 2020. We estimated by February 2021, we will have about eight or nine funds. But by March-April—by April- May, actually, we had over ten funds on the platform, aggregating about $17 [b]illion of AUM.

*Id.* ¶ 72 ("AUM" referring to "assets under management").

The July, August, and October presentations also included an investor deck. *Id.* ¶ 75. On the slide titled "Company Snapshot," investors were told about Triterras Fintech's "[f]irst mover advantage utilizing disruptive proprietary technology to solve critical industry problems," including that its platform "delivers previously unavailable access to lenders and borrowers, cost reduction, risk abatement and speed." *Id.* ¶ 76. The same slide emphasized the company's key metrics, such as "$17B Cumulative Funds Onboarded." *Id.* In response to questions about the lending capacity on Kratos, the IR Officer reiterated Koneru's statement that the company had "onboarded ten lenders that represent $17 billion in AUM," outpacing internal targets to "onboard eight lenders through the course of th[e] year." *Id.* ¶¶ 77–78. The Ten Lending Funds were represented to investors as "giv[ing] [the company] plenty of runway and dry powder to achieve" projections. *Id.* ¶ 79.

In various parts of its investor presentation materials, Triterras Fintech described traders and lenders as distinct constituencies of the platform, with the Trade Finance module addressing traders' lack of access to trade finance by facilitating lending from funders. *Id.* ¶¶ 82–83, 87. First, a slide in the July 29, 2020 investor deck, titled "Market Opportunity in Trade Finance," was used by the IR Officer to emphasize that there "is a significant shortage of available trade finance in the industry for transactions under $10 million . . . primarily driven by the fact that [l]ender's costs are too high to make smaller sized trade finance loans profitable." *Id.* ¶ 84 (internal quotation marks omitted). Triterras Fintech's Kratos was presented as "the solution."

*Id.* Next, a slide identified the three players on the Kratos platform as "[t]raders as operators," "[t]raders as borrowers," and "[l]enders." *Id.* ¶¶ 85–86. Then, a slide titled "Key Business Model" reinforced the notion that "[f]unders [s]eeking [b]orrowers" were distinct from traders. *Id.* ¶ 87. In addition, the slide titled "Kratos Value and Benefits" presented the value proposition of Kratos as bifurcated between that for "traders/borrowers" and "lenders." *Id.* ¶ 89 (emphasis omitted). The IR Officer further stated that:

> Kratos provides a strong complement of benefits to lenders and is attracting a community of them ready, willing, and able to make smaller size loans (sub $10 million, that is) to qualified traders. . . . Kratos simply makes it easier and more profitable for lenders to grow and manage their loan portfolios while meeting the requirements of compliance to international regulations.

*Id.* ¶ 90 (internal quotation marks omitted). The IR Officer emphasized that "Kratos is hyper-focused on addressing that $1.5 trillion annual shortfall in trade finance identified" by the World Trade Organization because "[l]ack of trade finance is often cited by traders as their largest constraint on growth"—and that "is a problem that Kratos is designed to address." *Id.* (internal quotation marks omitted).

**2. Representations in Proxy Statement**

The Proxy Statement incorporated information regarding Triterras Fintech that was solely provided by Symphonia and Ikon, the two investment entities through which Koneru solely and indirectly owned Triterras Fintech. *Id.* ¶ 95; *see also* Netfin Acquisition Corp., Definitive Proxy Statement (Schedule 14A) (Oct. 29, 2020) ("Proxy Stmt."), available at https://www.sec.gov/Archives/edgar/data/1776903/000121390020033999/defm1020_netfinacqco.htm. The Business Combination Agreement, annexed to the Proxy Statement, charged Symphonia and Ikon with responsibilities to ensure that investor filings, including the Proxy Statement, did not contain untrue statements of material facts and did not omit material information that would make statements misleading. Compl. ¶ 95.

In the Proxy Statement, the Trade Discovery module is described as covering "the entire lifecycle of a commodity trade," including "allowing users to find counterparties and transactions on the platform, create buy or sell orders, enter into sales agreements, generate invoices and request funds from lenders in the 'Trade Finance' module." Proxy Stmt. at 113; *see also* Compl. ¶ 99. The module allows traders "to make an 'open' order . . . that is visible to all users, as well as private orders to prearranged counterparties." Proxy Stmt. at 113.

The Trade Finance module is described as "provid[ing] the option for the parties to finance the purchase or sale of the commodities being traded using extended credit terms, generally through the purchase of receivables." *Id.*; *see also* Compl. ¶ 101. The module "is used by the lenders or financial institutions to receive funding requests, to assess the funding opportunity and to provide funding to borrowers" in addition to "support[ing] lenders in setting funding limits and viewing the transaction history of each commodity user." Proxy Stmt. at 113–14; *see also* Compl. ¶ 103. The Trade Finance module was responsible for $1.1 billion of Triterras Fintech's total transaction volume of $8.8 billion from launch in February 2020 through August 2020, and "[a]s of August 31, 2020 [Triterras Fintech] had onboarded lender users representing cumulative funds of approximately US$17 billion." Compl. ¶ 103 (quoting Proxy Stmt. at 114).

Various disclosures in the Proxy Statement discussed the role of lenders on the Trade Finance module, including:

- Kratos "is one of the world's largest (as measured by total transaction volume) commodity trading and trade finance platforms that connects and enables commodity traders to trade and source capital from lenders directly online." Proxy Stmt. at 11.

- Risk factors regarding lenders are: (a) "[a]s we do not provide trade financing, our ability to facilitate trade financing to Kratos users is entirely dependent on the willingness of lenders and other traders using the 'Trade Finance' module to finance the transactions and provide trade credit"; (b) Triterras Fintech may be "unable to continue to add . . . additional lenders to provide financing"; and (c) "the participation of third-party financing providers on the Kratos platform may cease at any time." *Id.* at 28, 31.
- "Kratos provides lenders with a community of prequalified trade finance borrowers, with their KYC, AML and financial information uploaded to the platform, giving potential trade finance providers the confidence to transact in this ecosystem." *Id.* at 119.
- "Trade Finance Volume is a function of the availability of funding at competitive rates from our lender users . . . ." *Id.* at 135.

*See* Compl. ¶ 105.

The Proxy Statement also represented that revenue for the Trade Finance module would be recognized when funds were disbursed: "Platform service fees are recognised at the point in time when funding was provided to the borrowers on the platform (i.e. lender has disbursed the loan funding to the borrower and the borrower has acknowledged the loan funding on the platform)." *Id.* ¶ 106; Proxy Stmt. at F-42.

**3. Alleged Fraudulent Scheme**

According to the SEC's allegations, the representations made by Koneru and Triterras Fintech were false or misleading. Only around 10% of the Trade Finance module's volume consisted of financing transactions involving the Ten Lending Funds—the remaining 90% consisted of trade transactions between two trader counterparties without a lender providing financing. Compl. ¶¶ 107–09. Thus, the Trade Finance module did not, in fact, address the $1.5 million trade finance shortfall plaguing SME traders globally or remedy the main constraint for growth of the market. *Id.* ¶ 110. Instead, the seller trader provided credit terms to the counterparty buyer so that the buyer's payment to the seller would not be immediately due. *Id.* ¶ 111. In other words, an SME trader used its own capital—or obtained financing off the Trade Finance module—to bridge any cash flow gap between when a trade was executed and when

payment was later due from its counterparty buyer. *Id.* ¶ 112. The Trade Finance module therefore did not revolutionize the physical commodities trading market for SME traders, contrary to how Kratos was marketed to investors. *Id.* ¶ 113.

The misrepresentations regarding Kratos stemmed from three purported deceptions. The first deception was that the February 2020 revenues of $186 million for the Trade Finance module—incorporated into the Proxy Statement—were misleading because they stemmed from either lending by the Koneru-owned TAPL Fund or from the extending of credit by Rhodium, another Koneru enterprise, to its counterparty buyers on trade transactions. *Id.* ¶ 115–16. The $186 million was comprised of $152 million from Rhodium-involved trades and $34 million from financings provided by the TAPL Fund. *Id.* ¶ 116. Put differently, no non-Koneru-associated entities were generating revenue for Triterras Fintech on the Trade Finance module in February 2020. Koneru was allegedly aware of the misleading reporting because he received weekly updates on the status of lending funds yet "knew or recklessly disregarded . . . the composition of the Trade Finance module volume." *Id.* ¶¶ 117–118. For instance, on February 26, 2020, he sent an email to Netfin that Kratos had onboarded six funds plus the TAPL Fund and would have $180 million of trade financing by the end of that day. *Id.* ¶ 119. Yet, as late as April 2020, only the TAPL Fund had a signed service agreement for Kratos. *Id.* In addition, on July 19, 2020, Koneru directed a Triterras Fintech employee, in response to a diligence request by Netfin's investment banker for detailed information on all trades facilitated by Kratos since inception, to "not . . . reveal the names of the Buyer/Seller/Lender." *Id.* ¶¶ 120–23 (internal quotation marks omitted). The Triterras Fintech employee had sent Koneru a spreadsheet that indicated that most of the platform's financing involved "counterparts giving credit extension."[3]

[3] According to the allegations, the spreadsheet attached in the email to Koneru contained two

*Id.* ¶ 121 (internal quotation marks omitted). Despite heavy reliance on Koneru-affiliated entities to buoy the Trade Finance module, the Proxy Statement indicated that such entities "accounted for [only] 26.7% of [the] revenue for the year ended February 29, 2020," adding that these were "platform fees where Rhodium initiated the commodity trade with its counterparty." *Id.* ¶ 125 (quoting Proxy Stmt. at 122). The number excluded the fees paid by Rhodium's trading counterparties on the Trade Discovery module and fees paid by traders borrowing from Koneru-related entities on the Trade Finance module (*i.e.*, a credit extension from Rhodium or a loan from the TAPL Fund), even if the transactions existed on the platform only because of Rhodium's or the TAPL Fund's involvement on the opposite side of a transaction. *Id.* Across both modules, the revenue flowing from Rhodium or the TAPL Fund approximated 70%—three times the near 27% reported. *Id.* ¶ 126.

The second deception was that only a tenth of the reported Trade Finance module volume through August 2020 involved the Ten Lending Funds, despite investor materials and presentations brandishing the total AUM available for lending. In the October 1, 2020 presentation deck, Triterras Fintech represented that the Trade Finance module had volume of $877 million, generating revenue of $11.4 million for the six-month period ended August 31, 2020, and that total revenue for the Kratos platform was approximately $23.7 million across the two modules. *Id.* ¶ 127. For the seven-month period from inception to August 2020, the Trade Finance module volume was represented to be $1.1 billion. *Id.* ¶ 128. However, according to the SEC, only about a tenth of the Trade Finance module volume involved financing transactions from the Ten Lending Funds—and virtually all of those transactions were with Rhodium. *Id.*

tabs: one for "Trading Transactions," and another for "Trade Finance." The latter tab showed 13 transactions which listed the TAPL Fund as the lender, and 95 that listed Rhodium as a lender with the notation "Credit Extension." Compl. ¶¶ 121–23.

¶ 130. The other 90% reported involved trader-to-counterparty credit extensions, and 30% of the total Trade Finance module volume was attributable to Rhodium extending trade-to-counterparty credit. The $877 million in trade finance activity could thus be broken out as follows:

| **Undisclosed Specifics of Trade Finance Module Recorded Activity (March – August 2020)** | **Approx. Volume** | **Percent of Total** |
|---|---|---|
| Traders other than Rhodium extending trader-to-counterparty credit | $534 million | 60.8% |
| Rhodium as trader extending trader-to-counterparty credit | $267 million | 30.4% |
| Lending Funds providing financing to Rhodium | $74 million | 8.5% |
| TAPL Fund providing financing to traders | $2 million | 0.3% |
| **Total Reported Trade Finance Activity (March – August 2020)** | **$877 million** | **100.0%** |

*Id.* ¶ 132. The October 2020 investor presentation used average flows from July and August 2020 to project $2.5 billion in expected Trade Finance module volume for the fiscal year ended February 28, 2021, but only 15% of that run-rate estimate involved lender-to-trader financing, all of which was to Rhodium as the trader. *Id.* ¶¶ 133–34. Given email updates on lending onboarding and status, Koneru allegedly knew (or recklessly disregarded) that the Ten Lending Funds other than his TAPL Fund had been slow to onboard completely onto Kratos. *Id.* ¶ 136. And although the Proxy Statement stated that Koneru-related entities (*i.e.*, Rhodium, TAPL Fund) accounted for 15.5% of revenue during the six-month period, the actual percentage of revenue attributable to Rhodium's and the TAPL Fund's transactions approximated 42%. *Id.* ¶¶ 139–40; *see* Proxy Stmt. at 122.

The third deception was that Koneru had directed off-platform loans to be added to Kratos as new activity to create a distorted financial picture of the company. *See* Compl. ¶¶ 141–43. To make it appear as though the Ten Lending Funds were using the Trade Finance module, Triterras Fintech employees, either at Koneru's direction or with his knowledge, added historical financing obtained by Rhodium from some of the Ten Lending Funds to the Kratos platform, despite the fact that the financing had been arranged off the platform. *See id.* ¶ 143.

The SEC provides three anonymized examples of this conduct, involving Lenders A, B, and C of the Ten Lending Funds. Lender A had a loan facility in place with Rhodium since June 2019, prior to the launch of Kratos. *Id*. On July 28, 2020, Koneru emailed Lender A to ask that it use Kratos to "approve the trades that have already been disbursed," and to do so "for all trades done since March 2020." *Id.* ¶ 144 (internal quotation marks omitted). Koneru received emails in August 2020 informing him that the import of Lender A's historical financing transactions to the Trade Finance module was underway and, in some instances, without Lender A's approval. *Id.* ¶ 145. About $65 million in trade financing from Lender A to Rhodium was recorded on Kratos as August or September 2020 activity, even though Lender A's documents indicate that the last financing disbursements to Rhodium occurred in late July 2020. *Id.* ¶ 146. Lender A never signed a Kratos service agreement, never approved any loans on Kratos, and never connected with SME traders seeking financing on the platform. *Id.* ¶ 147. Likewise, on August 21, 2020, Koneru emailed Rhodium and Longview to provide documents relating to their transactions with Lender B, totaling about $65 million in financing, so that those historical transactions could be added to Kratos after the fact. *Id.* ¶ 148–50. For Rhodium, Lender B had disbursed approximately $50 million from January to July 2020, yet that historical financing was being added to the Trade Finance module as September 2020 financing. *Id.* ¶ 149. For Longview, Lender B had purchased by March 2020 around $15 million of Longview's receivables for trades that occurred in January and February 2020, yet that financing was added to the module as September or October 2020 financing. *Id.* ¶ 150. Additionally, on July 6, 2020, after being notified that Lender C had completed the sign-up process, Koneru instructed a Triterras Fintech employee to move six historical trades by Lender C from February to May 2020 to the Trade

Finance module as August 2020 financing. *Id.* ¶ 152. Two historical financings were added to the module. *Id.*

## IV. After the Business Combination

Following the Business Combination, Koneru allegedly made or reiterated misleading statements to shore up Triterras's stock price. *Id.* ¶ 155. On December 17, 2020, in a Form 6-K signed by Koneru, Triterras disclosed that Rhodium faced a "statutory demand for payment" from one of its creditors, to which Rhodium was required to respond within 21 days or face a bankruptcy application. *Id.* ¶ 156. The Form 6-K further disclosed that Rhodium was preparing to "restructure its debts and continue its business a going concern," causing Triterras's stock to drop from over $13 per share to below $8 per share. *Id.* ¶¶ 157–58 (internal quotation marks omitted). On December 22, 2020, Triterras issued a press release and held an investor call, wherein Koneru reiterated that "Q3 net income and revenue remain on track" and that the "Kratos platform continues to gain commercial traction with SME community of traders and lenders," with a "significant increase in other traders that use the platform, as well as users of the trade finance business module." *Id.* ¶¶ 159–61 (internal quotation marks omitted). Although the Trade Finance module volume was represented to be $878 million for the third quarter of 2020 (ended November 30, 2020), it was not disclosed that more than 85% consisted of trader-to-counterparty credit extensions—not lending. *Id.* ¶ 162–63. The SEC alleges that Koneru knew of those pertinent facts because of a December 11, 2020 spreadsheet that provided a detailed breakdown of trade financing activity on the Kratos platform during the first three quarters of 2020. *Id.* ¶¶ 165–66. The spreadsheet indicated that all trade finance activity involved either the TAPL Fund as the lender or Rhodium or Longview as the borrower. *Id.*

On March 7, 2022, Triterras filed its Form 20-F for the fiscal year ended February 28, 2021, which Koneru signed and certified. *Id.* ¶ 167. The Form 20-F reported Trade Finance

module volume of $2.54 billion, resulting in revenue of more than $33 million, but—like prior filings—created a misleading impression that these figures reflected financing from the Ten Lending Funds, reiterating that Triterras had "onboarded lender users representing cumulative funds of $17 billion." *Id.* ¶¶ 168–70 (internal quotation marks omitted). Such statements in the Form 20-F echoed those made in the Proxy Statement, even though less than 10% of the Trade Finance module volume for the fiscal year ended February 28, 2021 involved financing by the Ten Lending Funds, and all of that activity was related to Rhodium or Longview, with the exception of a small amount of financing provided to SME traders by the TAPL Fund. *Id.* ¶ 171–72. Thus, Koneru-related entities had seemingly propped up the financial success of the Trade Finance module.

The SEC alleges that Koneru's misrepresentations and omissions were material. *Id.* ¶¶ 174–83. A clear understanding of the Ten Lending Funds' activities on the Trade Finance module would have been important to investors because trader-to-counterparty extensions did not align with the touted benefits of Kratos. *Id.* ¶ 180. Investment analysts relied on the representation that the Ten Lending Funds' $17 billion in AUM was accessible to assign ratings and price targets for stock. *Id.* ¶¶ 182–83. Furthermore, as the founder, CEO, sole director, and sole indirect owner of Triterras Fintech, the SEC alleges that Koneru was ultimately responsible for the statements made in SEC filings and shared with both investors and the public, including the representations made in the Proxy Statement. *Id.* ¶¶ 184–201 (also discussing provisions of the Business Combination Agreement charging Ikon and Symphonia, or Triterras Fintech, with the duty to ensure no material omissions in filings and communications with investors).

## PROCEDURAL HISTORY

The SEC filed its complaint on November 7, 2025. *See* Compl. The SEC asserted two claims: first, for violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act"),

and second, for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. *Id.* ¶¶ 202–07.

On May 21, 2026, Defendant filed this motion to dismiss, a memorandum of law in support of the motion, and the declaration of Ronald K. Anguas, Jr. in support of the motion. Dkt. Nos. 25–27. The SEC filed a memorandum of law in opposition to the motion to dismiss on June 26, 2026. Dkt. No. 30. On July 24, 2026, Koneru filed a reply memorandum of law in further support of the motion to dismiss. Dkt. No. 31. The SEC filed a notice of supplemental authority on July 30, 2026. Dkt. No. 32. Koneru filed a notice of supplemental authority on July 31, 2026. Dkt. No. 33.

## LEGAL STANDARD

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all reasonable inferences from those allegations in favor of the plaintiff. *See Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004). This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). The ultimate question is whether "[a] claim has facial plausibility," *i.e.*, "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the

plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

When a claim sounds in fraud, the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) also applies. Rule 9(b) requires that a "party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). A complaint making such allegations must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). "Despite those additional requirements, under Rule 9(b), malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *SEC v. Farnsworth*, 692 F. Supp. 3d 157, 176 (S.D.N.Y. 2023) (citation modified). Moreover, the Second Circuit has clarified that "the heightened pleading standards of the [Private Securities Litigation Reform Act] do not apply to cases brought by the SEC." *SEC v. Rio Tinto plc*, 41 F.4th 47, 52 n.4 (2d Cir. 2022); *cf.* 15 U.S.C. § 78u-4(b)(1) (requiring that, for a private plaintiff, a complaint alleging misleading statements or omissions "shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading").

## DISCUSSION

Koneru raises two bases for dismissal. First, that the SEC could not have brought the present action as a matter of law. Second, even if it could have, that the SEC has failed to state a claim. The Court addresses each in turn.

## I. Anti-Deficiency Act Defense

Koneru argues initially that the Court should dismiss the complaint because it was filed during the time of a lapse in congressional appropriations between October 1 and November 12, 2025, and therefore the Anti-Deficiency Act ("ADA" or the "Act") prohibited the employees of the SEC from filing it. Dkt. No. 26 at 13–24; *see also* Sean Stiff & Matthew D. Trout, Cong. Rsch. Serv., R48930, *Government Shutdowns: Applying the Antideficiency Act to a Lapse in Appropriations* (2026) ("Stiff & Trout"). Koneru does not claim that the SEC lacks the legal authority to sue him, and he concedes that the SEC could have sued him the day before or after the government shutdown. Dkt. No. 26 at 2. Instead, Koneru makes the narrower argument that the complaint should be dismissed because the SEC did not have "authority to file" during the shutdown, and the agency can refile if it so desires. *Id.* at 13.

The specific timing of the SEC's filing is consequential. The statute of limitations applicable to the SEC's claims for civil penalties and for disgorgement for negligence-based claims is five years.[4] The limitations period would have run during the shutdown for those remedies, *i.e.*, within a few days of when the complaint was filed on November 7, 2025. Dkt. No. 30 at 3; *see also* 28 U.S.C § 2462 (establishing that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be

---

[4] In the SEC's quiver, disgorgement is a limited and circumscribed remedy for monetary relief. *See generally Sripetch v. SEC*, 608 U.S. 555, 558–61 (2026). Because "disgorgement is a form of 'restitution measured by the defendant's wrongful gain,'" *Kokesh v. SEC*, 581 U.S. 455, 458–59 (2017) (alteration adopted) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. a (2010)), it "should not be for an amount beyond the actual benefit to the defendant," 6 T. Lee Hazen, Law Sec. Reg. § 16:18 (2026). "[C]ourts must deduct legitimate expenses before ordering [a] disgorgement" amount, and the SEC may not use disgorgement—an equitable remedy—as a "punitive sanction." *Liu v. SEC*, 591 U.S. 71, 79, 91–92 (2020). Thus, "the SEC may seek disgorgement of only (1) a defendant's net profits that were (2) causally connected to his unlawful conduct." *Sripetch*, 608 U.S. at 563. Given the scale of fraud the SEC alleges, disgorgement of Koneru's illicit net profit would not come close to matching the harm caused.

entertained unless commenced within five years from the date when the claim first accrued"); *SEC v. Stubos*, 634 F. Supp. 3d 174, 189 (S.D.N.Y. 2022) (discussing that, in 2021, Congress "extended the statute of limitations for SEC scienter-based claims for disgorgement to ten years and created a ten-year statute of limitations for equitable remedies including injunctions and bars").[5] And because Koneru has retired, *see* Dkt. No. 26 at 1, any claim for injunctive relief might be meaningless. "Injunctive relief is only warranted where 'there is a substantial likelihood of future violations of illegal securities conduct.'" *SEC v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 251 (S.D.N.Y. 2019) (quoting *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998)), *aff'd*, 982 F.3d 68 (2d Cir. 2020); *see also Stubos*, 634 F. Supp. 3d at 192 ("Injunctive relief may be granted only if, at the time the injunction is requested, a threat of future illegal conduct exists."). Thus, were the Court to dismiss this case and require the SEC to refile, there might be little point in it doing so—it would be left without the most potent weapon to punish securities wrongdoers and to deter future wrongdoing. In essence, while clothed in the garb of a request that the Court dismiss this case and require the SEC to replead, Koneru's motion seeks to relieve him of any responsibility for his alleged securities fraud violations.

The Court first provides an overview of the ADA and its relevant provisions before turning to Koneru's specific contentions.

### A. Statutory Framework

In the constitutional design, Congress maintains the power of the purse. *See Biden v.*

[5] This Court has previously explained how the National Defense Authorization Act for Fiscal Year 2021 ("NDAA") modified the default five-year statute of limitations contained in 28 U.S.C. § 2462. *See Stubos*, 634 F. Supp. 3d at 189–90. The NDAA applies retroactively and would revive even "otherwise stale claims" that fell within the revised ten-year statute of limitations period. *Id.* at 196 ("If the effect of the application of the NDAA to pending cases is to revive otherwise stale claims, its effect as to its application to cases commenced after the date of enactment must be the same.").

*Nebraska*, 600 U.S. 477, 505 (2023) ("Among Congress's most important authorities is its control of the purse."). The Constitution's Appropriations Clause provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. An appropriation is any law "that authorizes expenditures from a specified source of public money for designated purposes." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 424 (2024). One mechanism by which Congress has asserted its budgetary authority over executive agencies is the ADA. *Atlas Brew Works, LLC v. Barr*, 391 F. Supp. 3d 6, 9 (D.D.C. 2019) ("Federal statutes reinforce Congress's control over appropriated funds. Key among these statutes is the Anti-Deficiency Act." (citation modified)), *aff'd*, 820 F. App'x 4 (D.C. Cir. 2020) (summary order).

At its core, the ADA "prevents federal officers from 'mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation.'" *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 197 (2012) (alterations in original) (quoting 31 U.S.C § 1341(a)(1)(A)). In addition, officers or employees of the federal government are also barred from involving the "government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(B); *see Hercules Inc. v. United States*, 516 U.S. 417, 427 (1996) ("The Anti-Deficiency Act bars a federal employee or agency from entering into a contract for future payment of money in advance of, or in excess of, an existing appropriation."). The Act's "requirements 'apply to the official, but they do not affect the rights . . . of the citizen honestly contracting with the Government.'" *Salazar*, 567 U.S. at 197 (quoting *Dougherty v. United States*, 18 Ct. Cl. 496, 503 (1883)). The purpose of the ADA was to curb the practice of "coercive deficiencies," wherein "executive officials often exhausted their appropriations prematurely and spent or obligated funds on their own initiative

while counting on Congress to make up the shortfall after the fact." Zachary S. Price, *Public Functions and Private Resources*, 103 Wash. U. L. Rev. 1813, 1835 (2026); *see Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1448–49 (Fed. Cir. 1997) (explaining that the ADA was designed to "address the problem that Executive Branch officials were obligating funds before they were appropriated by Congress, and then making deficiency requests for appropriations that Congress had little choice in deciding"); Stiff & Trout at 5 ("This practice backed Congress into a corner, presenting a Hobson's choice of passing the deficiency appropriation or having government functions cease.").

To the same end of curtailing coercive deficiencies, the ADA also contains a bar against voluntary services, codified at 31 U.S.C. § 1342. *See* Stiff & Trout at 8. That provision forbids any officer or employee or the United States Government from "employ[ing] personal services exceeding that authorized by law except for emergencies involving the safety of human life or the protection of property." 31 U.S.C. § 1342. Any officer or employee violating the provision is "subject to appropriate administrative discipline including, when circumstances warrant, suspension from duty without pay or removal from office." 31 U.S.C. § 1349(a). An officer or employee who knowingly and willfully violates that provision is subject to criminal punishment. *Id.* § 1350 ("An officer or employee . . . knowingly and willfully violating section 1341(a) or 1342 . . . shall be fined not more than $5,000, imprisoned for not more than 2 years, or both."). If an officer or employee of an executive agency violates Section 1342, "the head of the agency . . . [must] report immediately to the President and Congress all relevant facts and a statement of actions taken," and a copy of each report must also be transmitted to the Comptroller General." *Id.* § 1351.

The voluntary-services bar prevents agencies from "accepting services from a person

who would then expect payment for the services, even though the person may have no legal right to payment." Stiff & Trout at 8. "[T]he evident concern underlying this provision is not government agencies' acceptance of the benefit of services rendered without compensation. . . . [It is] to avoid claims for compensation arising from the unauthorized provision of services to the Government by non-employees, and claims for additional compensation asserted by government employees performing extra services after hours." *Authority for the Continuance of Government Functions During a Temporary Lapse in Appropriations*, 43 U.S. Op. Atty. Gen. 293, 302 (1981) ("Civiletti Op."). Thus, "[i]n accordance with the Appropriations Clause and the Anti-Deficiency Act, federal agencies must cease their activities if Congress does not appropriate funding, unless those activities qualify as an exception to the Anti-Deficiency Act." *Nat'l Treasury Emps. Union v. United States*, 444 F. Supp. 3d 108, 111 (D.D.C. 2020). In other words, "a lapse in appropriations" requires an agency to stop "employ[ing] the services of their employees," leading to a government shutdown, Civiletti Op. at 294, except in limited circumstances of "emergencies involving the safety of human life or the protection of property," 31 U.S.C. § 1342.

**B. Application**

The SEC filed the present action during a government shutdown, thereby implicating the ADA's voluntary-services bar. Dkt. No. 26 at 13–14; Dkt. No. 30 at 3, 19. On the one hand, Koneru argues that this violation of the ADA is an independent basis for dismissal, because the "SEC had no authority" at the time of filing, and the only appropriate remedy "where federal agencies bring claims outside of the agency's statutory authorization to sue" is to dismiss. Dkt. No. 26 at 13. Moreover, according to Koneru, the SEC's civil enforcement action does not qualify as an "emergency" or implicate "the safety of human life or the protection of property" to fall into the ADA's limited carveout. *Id.* at 14–24. On the other hand, the SEC counters that the

ADA does not offer dismissal as a remedy and, in any event, its enforcement activity in this instance falls within the ADA's exception as emergency activity undertaken to protect property in the form of civil penalties and non-scienter-based disgorgement. Dkt. No. 30 at 19–24.

As an initial matter, the parties do not contest the Court's ability to adjudicate Koneru's statutory defense. Dkt. Nos. 32–33; *see Koneru v. SEC*, 2026 WL 2185180, at *4 (D.D.C. July 29, 2026).[6] Courts in this District and the Second Circuit have considered challenges to the SEC's statutory authority as a defense in an enforcement action. *See, e.g.*, *SEC v. Alpine Sec. Corp.*, 768 F. App'x 93, 94 (2d Cir. 2019) (summary order) (affirming district court's holding, in the context of rejecting an interposed defense on summary judgment, that "the SEC does have the [statutory] authority to bring the enforcement action"). Reaching the defense, the Court addresses then whether the ADA strips the SEC's statutory authorization, thereby permitting or requiring dismissal as a remedy.

---

[6] Koneru sought to collaterally challenge the SEC's civil enforcement action in the United States District Court for the District of Columbia, asserting an Administrative Procedure Act ("APA") claim. *See Koneru*, 2026 WL 2185180. Judge Sooknanan dismissed the action because this Court provides an "other adequate remedy" for Koneru to challenge the agency's action. *Id.* at *4 (alteration omitted) (citing 5 U.S.C. § 704). Koneru does not bring an APA counterclaim in this proceeding. The APA permits a court to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), but any APA counterclaim by Koneru would be premature because there is no "final agency action," *id.* § 704. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 809 (2024) ("An APA plaintiff does not have a complete and present cause of action until she suffers an injury from final agency action . . . ."); *see also Bennett v. Spear*, 520 U.S. 154, 177–178 (1997) (for an agency action to be "final," it must be the "consummation of the agency's decisionmaking process" and be an action by "which . . . legal consequences will flow" (internal quotation marks omitted)). Nevertheless, Koneru may still challenge the SEC's statutory authority as a defense in this Court. *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731–32 (D.C. Cir. 2003) ("If the Government brings an enforcement proceeding, such parties may defend themselves on the ground that the agency lacks jurisdiction" or "lacks statutory authority to regulate."); *cf. Citizens for Resp. & Ethics in Washington v. FEC*, 904 F.3d 1014, 1018 (D.C. Cir. 2018) ("[T]he law is well-settled that those adversely affected by an agency's [action] . . . may challenge that [action] on the ground that it conflicts with the statute from which its authority derives." (citation modified)).

The parties' statutory dispute hinges on the interplay of the ADA with the SEC's enforcement authority pursuant to the Securities Act and Exchange Act. For Koneru's argument to succeed and necessitate dismissal, the ADA must be construed to at least temporarily suspend the SEC's statutory authority to bring a civil enforcement action during a government shutdown. However, the text and purpose of the ADA belie such a construction.

Agencies are creatures of statute and cannot act beyond the bounds set by Congress. *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). Under the Securities Act and Exchange Act, the SEC is granted "statutory authority to enforce the nation's securities laws." *Lucia v. SEC*, 585 U.S. 237, 241 (2018). As it has done here, the SEC can "file a suit in federal court" to "enforce" the "antifraud provisions" of "Section 17(a) of the Securities Act [and] Section 10(b) of the . . . Exchange Act." *SEC v. Jarkesy*, 603 U.S. 109, 116–17 (2024). The ability of the SEC to bring civil enforcement actions in district court is codified at 15 U.S.C. §§ 77t, 78u, and 80b-9; these provisions delineate the specific relief the SEC can request, and on what basis. No provision of the Securities Act or the Exchange Act or any other federal law rescinds the SEC's legal authority to enforce the relevant laws in the absence of appropriations. Instead, the ADA on its face limits the authority of agency employees and officers temporarily during a lapse in funding. While the ADA constrains the practical ability of the SEC to act, the agency itself retains its legal status and authority.

As applied here, the ADA thus does not *sub silentio* rescind the SEC's statutory authority to initiate and continue enforcement action, even during a government shutdown. Section 1341 of the ADA provides that during a lapse in funding, an agency officer or employee may not make "or authorize an expenditure or obligation exceeding an amount available in an appropriation," 31 U.S.C. § 1341, and Section 1342 of the ADA prohibits officers and employees of the United

States Government from accepting voluntary employment "except for emergencies involving the safety of human life or the protection of property," *id.* § 1342. Thus, an agency, in general, may not employ the services of their employees upon a lapse in appropriations. *See* Civiletti Op. at 294.[7] The voluntary-services bar precludes "government officers and employees [from] . . . involv[ing] the Government in contracts for *employment*, *i.e.*, for compensated labor, except in emergency situations." *Id.* at 302 (emphasis in original). The SEC does not dispute that—were it not for the emergency exception—its initiation of the present proceeding constitutes employment of services during a lapse in appropriations and thus the employees who initiated the action would have violated the ADA's prohibition. *See* Dkt. No. 30 at 19; Dkt. No. 31 at 2. But the ADA acts upon the individual rather than the agency itself, and it provides an explicit scheme of sanctions and remedial measures to ensure compliance, none of which includes nullifying agency action. Instead, each provision targets the violating employee or officer, with only a reporting provision potentially affecting an agency writ large. Section 1349 provides that the specific "officer or employee . . . violating section 1341(a) or 1342 . . . shall be subject to appropriate administrative discipline including, when circumstances warrant, suspension from duty without pay or removal from office." 31 U.S.C § 1349(a). In addition to administrative discipline, an officer or employee that "knowingly and willfully" violates the ADA may be "fined not more than $5,000, imprisoned for not more than 2 years, or [suffer] both" consequences. *Id.* § 1350. Moreover, any violation also needs to be "report[ed] immediately"

[7] Attorney General Civiletti's view that "agencies are not, in general, authorized by law to employ the services of their employees upon a lapse in appropriations" cannot be read to go so far as to mean that agencies are legally disabled from continuing any activities that Congress has otherwise granted them authority to do. Civiletti Op. at 294. Instead, consistent with the text of the ADA, agencies may lack the practical ability to perform most agency functions they are otherwise legally authorized to perform.

by the agency "to the President and Congress" with "all relevant facts and a statement of actions taken," and the report would also need to be "transmitted to the Comptroller General." *Id.* § 1351. The full suite of sanctions is represented in 31 U.S.C. §§ 1349–1351. No provision speaks to the invalidation of agency action or the temporary annulment of an agency's statutory enforcement authority as a consequence for violating the ADA. Even if the ADA requires that an agency cease to act as a matter of fact, it does not disable an agency as a matter of law.

The Court "adhere[s] to a frequently stated principle of statutory construction: when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." *U.S. ex rel. The Saint Regis Mohawk Tribe v. President R.C.—St. Regis Mgmt. Co.*, 451 F.3d 44, 51 (2d Cir. 2006) (citation modified); *accord Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 97 (1981) ("[T]he authority to construe a statute is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt."). Stated differently, "[w]hen Congress has enacted a comprehensive scheme with integrated enforcement procedures, there exists a strong presumption that additional remedies were deliberately omitted from the statute." *Bowers v. Pa. Higher Educ. Assistance Agency*, 2011 WL 3585986, at *3 (S.D.N.Y. July 29, 2011). Because the ADA on its face does not authorize dismissal as a remedy to an agency's violation of its mandates, the Court presumes that Congress did not intend courts to have the authority to provide such relief.

The absence of any express provision allowing the use of the ADA as a defense in an agency enforcement proceeding is conspicuous. Congress knew how to create a defense to agency action taken by an employee in violation of federal law when it intended to do so. *Cf. Peterson v. Bank Markazi*, 121 F.4th 983, 1004 (2d Cir. 2024) ("'[W]hen, as here, Congress has

shown that it knows how to adopt the omitted language or provision,' it is 'particularly inappropriate' for a court to supplement the statutory framework with features that do not appear in the text." (alteration in original) (quoting *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019))). It did so in connection with the Paperwork Reduction Act ("PRA"). The PRA is administered by the Office of Management and Budget ("OMB") and "charges OMB with developing uniform policies for efficient information processing . . . both within and among agencies." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 32 (1990). The PRA prevents agencies from "adopting regulation which impose paperwork requirements on the public unless the information is not available to the agency from another source within the Federal Government." *Id.* at 32–33. All requests for information are channeled through the Office of Management and Budget, and once "OMB approves an information collection request, it issues a control number" to be placed on all forms. *Id.* at 40. If an agency fails to "display a valid control number" on an information collection request—or "fails to inform the person who is to respond to the collection . . . that such person is not required to respond to the collection of information unless it displays a valid control number"—then an individual cannot be subjected to "any penalty" for a failure to comply with the request. 44 U.S.C. § 3512(a)(1)–(2). Moreover, any individual subject to enforcement for failure to comply may raise the lack of a valid control number as a "*complete* defense [or] bar . . . at any time during the agency administrative process *or judicial action.*" *Id.* § 3512(b) (emphasis added).

The Court "presume[s] that, where words differ as they differ here, Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62–63 (2006) (internal quotation marks omitted). In juxtaposition to the PRA, the ADA contains no provision allowing noncompliance to operate as a defense to

an agency enforcement proceeding that a litigant may interpose.[8] Instead, all of the provisions enlist the executive branch to police errant employees and officers, leaving little room for the judiciary to intervene on an agency-wide basis. The Court's conclusion is reinforced by the Government's status as a "jural entity." 4 Moore's Federal Practice § 17.27 (3d ed. 2024). "[F]ederal statutes that confer federal subject matter jurisdiction by and against" agents of the United States also grant those agents the "requisite capacity" to sue. *Id.*; *see also* Fed. R. Civ. P. 17; 28 U.S.C. §§ 1345–1346. The ADA does not purport to revoke any agency's capacity to sue during a lapse in appropriations.

Koneru's arguments to the contrary are unconvincing. First, to avoid the force of this presumption, Koneru contends that ordinary administrative law principles mandate that a violation of the ADA requires dismissal, as would be the case if an agency action is beyond the purview of its enforcement authority, citing *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019). But that decision is readily distinguishable. There, the Third Circuit considered whether the Federal Trade Commission was operating within the bounds of the Federal Trade Commission Act, specifically concerning when the agency "may bring suit in a district court of the United States." 15 U.S.C. § 53(b); *see* 917 F.3d at 153–54 (assessing defendant's argument that "the FTC had failed to plead sufficient facts to invoke its authority under Section 13(b)" of the Federal Trade Commission Act). Section 13(b) provides that the FTC may bring a "suit . . . to enjoin any such act or practice" by a "person, partnership, or corporation" that is "violating, or is about to violate, any provision of law enforced by the" FTC. 15 U.S.C. § 53(b).

---

[8] The PRA is not the only example of a trans-substantive administrative law statute that provides an explicit, complete defense against agency action. For instance, the Federal Register Act explicitly notes that, without notice, "a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a).

The Third Circuit determined that the FTC's lawsuit did not concern alleged conduct that might be "violating" or is "about to violate" a substantive provision enforced by the FTC and, therefore, the lawsuit could not have been brought in the first instance. 917 F.3d at 155–56. That decision flowed straightforwardly from the plain text of the provisions of the FTC's enabling statutes. In that vein, were Koneru to argue that the SEC's action falls beyond the scope of the Securities Act or Exchange Act, and the Court to agree, Koneru would likewise be entitled to dismissal as a remedy. But the ADA does not define or constrain the prosecutorial authority of an agency. The consequences for an agency employee violating the ADA (*i.e.*, for an agency not ceasing its activities) do not concern the agency's authority to file a lawsuit or enforce.[9] *See* 31 U.S.C. § 1350.

Second, Koneru recites the basic proposition that an agency can only act through its employees. Dkt. No. 31 at 10. From that axiom, Koneru argues that the ADA renders null an agency's power to act. *Id.* Though beguiling, Koneru's uncontroversial premise does not lead to the legal conclusion he seeks. The ADA does require agency employees to cease activities in

---

[9] Two doctrines suggest that the Court should refrain from reading freestanding judicial oversight into the ADA. First, under the "doctrine of separation of powers," the Court refuses "to assume powers that are vested in the concurrent branches." *In re Joint E. & S. Districts Asbestos Litig.*, 891 F.2d 31, 35 (2d Cir. 1989). "[T]he wisdom of decisions made by the executive and legislative branches are not subject to judicial review" absent the implication of constitutional issues, which Koneru does not raise. *Id.* Here, the ADA vests discretion of its enforcement in the executive branch. Second, although raised as a defense, the doctrine concerning a private right of action is instructive to understand what the ADA does and does not provide. "[I]n the absence of statutory intent to create a private right and remedy, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 94 (S.D.N.Y. 2022) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001)). No provision of the ADA provides an individual with a cause of action to enforce its provisions. *See Feldman v. Bowser*, 315 F. Supp. 3d 299, 305 (D.D.C. 2018) ("No private right of action for declaratory, mandatory, or injunctive relief exists under the Anti-Deficiency Act." (citation modified)).

most circumstances. Thus, courts have sometimes said that an "agency must generally cease operations pursuant to the Antideficiency Act." *Am. Fed'n of State Cnty. & Mun. Emps., AFL-CIO v. U.S. Off. of Mgmt. & Budget*, 807 F. Supp. 3d 1004, 1018 (N.D. Cal. 2025); *see also Nat'l Treasury Emps. Union*, 444 F. Supp. 3d at 111 ("In accordance with the Appropriations Clause and the Anti-Deficiency Act, federal agencies must cease their activities if Congress does not appropriate funding, unless those activities qualify as an exception to the Anti-Deficiency Act."). Those courts may be correct insofar as they are describing the factual reality that agencies cannot engage in activities without violating the ADA, but those decisions do not stand for the proposition that an agency's legal capacity, authority, and statutory powers are somehow revoked during a lapse in appropriations. Congress did not craft a self-executing compliance mechanism that would neuter agency activity as a legal matter for a violation of the ADA. Instead, Congress chose to penalize government employees or officers for the noncompliance, rather than set repercussions for agencies as entities, even though other statutes do target "agency action" and expressly render agency activity invalid in the absence of statutory authorization. *See, e.g.*, 5 U.S.C. § 706.

The purposes and history of the ADA confirm the Court's conclusion. Originating with legislation in 1870, *see* Stiff & Trout at 5, Congress passed the progenitor of the present-day ADA in an effort to prevent the Government from "bind[ing] itself to an obligation before an appropriation exists to meet the obligation." *Gov't Acquisitions, Inc. v. United States*, 183 Fed. Cl. 205, 220 (2026). As discussed above, in the government employment context, Congress sought to protect its power over the purse by preventing agencies from obligating appropriations to pay wages on work performed during a government shutdown. But the core purpose of the ADA is to prevent open-ended obligations outside the context of a government shutdown. In

that realm, the Supreme Court has held that the protections now codified in the ADA prohibit a counterparty from binding the Government to a contract for a longer term than feasible under appropriations at the time of entering into the agreement. *See Goodyear Tire & Rubber Co. v. United States*, 276 U.S. 287, 291–93 (1928) (citing *Leiter v. United States*, 271 U.S. 204, 207 (1926)). The ADA thus sets a default rule that a government contractor bears the risk of inadequate appropriation.

Koneru latches onto a line of cases that has found government contracts exceeding then-existing appropriations to be *void ab initio* to argue that the same logic applies to the SEC's enforcement action. *See* Dkt. No. 31 at 6 (citing *Davis & Assocs., Inc. v. District of Columbia*, 501 F. Supp. 2d 77, 80 (D.D.C. 2007)). On Koneru's theory, if a contract signed in violation of the ADA is void, so too must an enforcement action commenced by employees in violation of the ADA be void and entitled to no legal recognition. Koneru's analogy of comparing a contract to a complaint—both documents having legal significance—may be apt, but his conclusion is wrong. A contract entered into by an agent without authority is voidable, not void. *Home Fed. Bank of Tenn., F.S.B. v. United States*, 57 Fed. Cl. 676, 689 (2003) ("A contract made without adequate authority is voidable."). Voidability based on an agent's deficient authority does not negate the legal status of the agreement at the time it is reached but rather gives the principal the right, after the fact, to disavow its obligations. *Cf. Hale v. Teledoc Health, Inc.*, 2021 WL 1163925, at *5 (S.D.N.Y. Mar. 25, 2021) ("A principal may ratify an agent's unauthorized conduct even if the agent lacked actual authority." (citing Restatement (Third) of Agency § 4.04 (2006))). A voidable contract "[u]nless rescinded . . . imposes on the parties the same obligation as if it were not voidable." *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 31 (2d Cir. 2001) (alteration in original) (quoting 1 Williston on Contracts § 1:20 (4th ed. 1990));

*see also* 1 Williston on Contracts § 1:20 (4th ed. 2026) (voidable contract "remains intact until the party who has the power of avoidance elects to exercise it, and a party who has the power of avoidance may extinguish that power by ratification of the contract").

As the Court of Federal Claims has explained, quoting Judge Pauline Newman, a contract is not necessarily "void or invalid" because of a "violation of a statute or regulation." *PCL Const. Servs., Inc. v. United States*, 41 Fed. Cl. 242, 263 (1998) (quoting *AT&T Co. v. United States*, 124 F.3d 1471, 1480–81 (Fed. Cir. 1997) (Newman, J., dissenting), *reh'g en banc granted*, *judgment vacated*, 136 F.3d 793 (Fed. Cir. 1998)), *aff'd*, 96 F. App'x 672 (Fed. Cir. 2004). It is void or invalid if it is "clearly illegal in a material respect, in that [it] violated provisions explicitly limiting the authority of a party to enter into the contract, or expressly prohibiting the contract altogether." *Id.* at 264 (quoting *AT&T Co.*, 124 F.3d at 1480–81 (Newman, J., dissenting)); *see* Restatement (Second) of Contracts § 7 (1981). A contract that "would violate the law or public policy irrespective of the conditions in which the contract was formed, . . . *e.g.*, a contract to commit murder," is void. *Koby v. United States*, 47 Fed. Cl. 99, 104 (2000) (quoting *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 431–32 (1998) (Breyer, J., concurring)). The courts will not enforce it. *See, e.g*, *Schlessinger v. Valspar Corp.*, 686 F.3d 81, 85 (2d Cir. 2012) ("New York courts will not enforce illegal contracts."); *Stone v. Freeman*, 82 N.E.2d 571, 572 (N.Y. 1948) ("It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose."). By contrast, a "contract [that] has been made under conditions that would justify giving one of the parties a choice as to validity" is "voidable." *Koby*, 47 Fed. Cl. at 104 (quoting *Oubre*, 522 U.S. at 431–32 (Breyer, J.,

concurring)). An example is a contract with an infant who lacks capacity to form a legal obligation. *See, e.g.*, *FTC v. Verity Int'l, Ltd.*, 124 F. Supp. 2d 193, 202 (S.D.N.Y. 2000) ("[W]here the person who accepts the offer is incompetent or a minor, the contract is voidable."); *see also I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 208 (S.D.N.Y. 2015) ("It is well established under New York law that '[a]n infant's contract is voidable and the infant has an absolute right to disaffirm.'" (alteration in original) (quoting *Scott Eden Mgmt. v. Kavovit*, 149 Misc. 2d 262 (N.Y. Sup. Ct. 1990))).

A contract entered into by an agent outside the scope of her authority is voidable. *Landcastle Acquisition Corp. v. Renasant Bank*, 57 F.4th 1203, 1224 (11th Cir. 2023) ("Both state and federal courts applying state law have held an agent's lack of authority renders a contract voidable, not void."). In that circumstance, the principal retains the authority to affirm or ratify the agreement and, when he does so, the contract retains legal status as of the moment it was signed. *See, e.g.*, *The Capitaine Faure*, 10 F.2d 950, 964 (2d Cir. 1926) ("If [the principal] ratifies, he accepts the contract which the agent made, and it becomes binding and takes effect as of the date when the agent made it."). "A party may ratify a contract [entered into by an unauthorized agent] by intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it." *Northwell Health, Inc. v. Grp. Hospitalization & Med. Servs., Inc.*, 183 F.4th 78, 98 (2d Cir. 2026) (citation modified). The legal obligations of the agreement are therefore not, and could not have been, null and void as of the moment it is made. So long as the principal does not dishonor the agreement, the third party is bound. A principal's "manifestation of assent or other conduct indicative of consent" is the "sole requirement" to ratify, regardless of whether the principal's assent is "communicated to

the agent or to third parties whose legal relations will be affected by the ratification." Restatement (Third) of Agency § 4.01 cmt. b (2006); *see also id.* § 4.01(2) ("A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents."). The principal's performance serves to ratify the contract. Restatement (Second) of Contracts § 380 cmt. a (1981) ("A party who has the power of avoidance may lose it by action that manifests a willingness to go on with the contract. Such action is known as 'affirmance' and has the effect of ratifying the contract. . . . On ratification, the affirming party is bound as from the outset and the other party continues to be bound."). Silence may be enough to draw an inference of assent. *See* Restatement (Third) of Agency § 4.01 cmt. f ("Delay in expressing an objection to an unauthorized act may result in ratification . . . ."); *Merex A.G. v. Fairchild Weston Sys., Inc.*, 810 F. Supp. 1356, 1370 (S.D.N.Y. 1993) ("A principal can become bound by unauthorized acts through ratification, and ratification can occur by silence."), *aff'd*, 29 F.3d 821 (2d Cir. 1994), *and aff'd*, 54 F.3d 765 (2d Cir. 1995); *cf. Trs. of Am. Fed'n of Musicians & Employers' Pension Fund v. Steven Scott Enters., Inc.*, 40 F. Supp. 2d 503, 511 (S.D.N.Y. 1999) ("Affirmance of the intent to ratify may be inferred from knowledge of the principal coupled with a failure to timely repudiate, where the party seeking a finding of ratification has in some way relied upon the principal's silence." (citation modified)).

The principle helps decide this case. The ADA acts upon the agency officer or employee, disabling him or her from obligating government funds or working voluntarily for the Government during a lapse in funding. 31 U.S.C. § 1342. It does not act upon the agency, depriving it of the legal capacity to form an agreement. Performance of an agreement reached during a lapse in funding is not illegal merely by virtue of the date on which the agreement was

reached. *Godley v. United States*, 5 F.3d 1473, 1476 (Fed. Cir. 1993) ("Illegal acts by a Government contracting agent do not alone taint a contract and invoke the void *ab initio* rule."). A court may enforce such an agreement as of the date it was entered—if the agency after the fact insists upon enforcement or otherwise complies with the agreement's obligations. A contract formed during a government shutdown thus is properly considered to be voidable. Where, as here, a statute operates to potentially deprive an agent of their authority to enter into contracts, "a government agent's lack of authority to bind the government provides the *government* with the option to void the contract rather than the *counterparty*." *Jain v. United States*, 181 Fed. Cl. 214, 222 (2026); *see also Spahn v. Sec'y of Health & Hum. Servs.*, 133 Fed. Cl. 588, 598 (2017) (although an agent's apparent authority cannot bind the Government, "when a government agent does not possess express or implied actual authority to bind the United States in contract, the government can still be bound by contract if the contract was ratified by an official with the necessary authority"). If an agency has committed an ADA violation, "[t]he majority case law view holds that the agency may not make any additional payments from the appropriation, but the contract will remain valid," generally "only up to the amount of the available appropriation"—but it is not void at inception. Steven W. Feldman, 1 Government Contract Awards: Negotiation and Sealed Bidding § 1.11 (Nov. 2026).[10]

[10] This principle is similar to and can be analogized to the so-called "*Christian* doctrine," stemming from *G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 427 (Ct. Cl. 1963). *See Metro. Transp. Auth. v. Duffy*, — F. Supp. 3d. —, 2026 WL 588117, at *54–55 (S.D.N.Y. Mar. 3, 2026). "The *Christian* doctrine instructs that a court should read into every federal procurement contact an unexpressed clause when it finds '(1) that the clause is mandatory; and (2) that it expresses a significant or deeply ingrained strand of public procurement policy.'" *Id.* at *54 (quoting *K-Con v. Sec'y of Army*, 908 F.3d 719, 724 (Fed. Cir. 2018)). A regulation can set forth a "mandatory contract clause" that must be incorporated pursuant to the *Christian* doctrine. *See Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 672 (S.D.N.Y. 2025). The Government ordinarily "may cancel as illegal a contract that violates procurement statutes or regulations." *Rockies Exp. Pipeline LLC v. Salazar*, 730 F.3d 1330, 1338 (Fed. Cir. 2013)

Thus, applying Koneru's analogy, even assuming the SEC employees who filed the complaint against Koneru did not have the authority to work during the government shutdown, akin to a government employee who did not have authority to commit the government to a contract without adequate appropriations, the conclusion would not be to relieve Koneru of the consequences of the government employees' action. It would be to give the SEC an after-the-fact right to dismiss the complaint on the grounds that the persons who filed it lacked the legal authority to do so. *See Jain*, 181 Fed. Cl. at 222 ("the [agency] is the only contracting party capable of disavowing the [contract] . . . on the grounds that the officials who signed the contract lacked valid governmental authority," and "[t]he government has declined to do so here"); *see also* Restatement (Second) of Contracts § 7 cmt. b ("Usually the power to avoid is confined to one party to the contract . . .").

Koneru's argument, taken to its logical and necessary conclusion, would have "absurd results" that Congress could never have intended. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *see also FCC v. Consumers' Rsch.*, 606 U.S. 656, 679 (2025) (rejecting argument that a statute effected an unconstitutional delegation of legislative power because the legal position taken "produces absurd results, divorced from any reasonable understanding of constitutional values"). The ADA, by its plain language, permits an agency to use an employee in the case of "emergencies involving the safety of human life or the protection of property." 31 U.S.C. § 1342. One can easily imagine the numerous circumstances in which such exception arguably

(citing *Schoenbrod v. United States*, 410 F.2d 400, 403–04 (Ct. Cl. 1969)). But if the Government does not cancel it, the agreement remains binding on the counterparty.

applies. The regulation of traffic on the Nation's rail lines and over the skies and the deployment of emergency responders in the event of a natural disaster can involve the safety of human life. The delivery of energy to an agency's facilities, the maintenance of computer servers amidst a cyberattack, and the stationing of guards outside Fort Knox to protect the Nation's gold reserves may all be necessary for the protection of property. *See also* Stiff & Trout at 24 (discussing invocation of the emergency exception for activities to protect the Government's security interest in pledged collateral in bankruptcy proceedings and tax remittances sent to the Internal Revenue Service). An agency may feel the need to bring a legal action in order to enjoin a putative wrongdoer from posing some imminent risk to property or life. Section 1342 does not disable an agency from taking actions for such purposes—or agency employees from entering into agreements with private parties or filing lawsuits to ensure that human life will be safe and property protected. Yet, under Koneru's argument, the counterparty to every such agreement would have the right, after the fact, to claim that a contract entered into during a lapse in government funding or a lawsuit filed during that period was null and void because, even though the agency acted on the belief that it was necessary for human safety or the protection of property, such belief was mistaken.

The *ex ante* effect on the Federal Government would be dramatic, ensuring an agency could never rely with certainty on a counterparty's promise to perform its end of a bargain since, at any moment after the shutdown ended, the counterparty would be able to claim that there never was a "real" emergency or threat to property or life in an effort to retrade a deal that it—with the benefit of hindsight—has determined to be unfavorable. Koneru's argument would "wreak havoc across the whole range of federal contracting, from defense contracts to the provision of Medicaid funding to states." *Metro. Transp. Auth. v. Duffy*, ––– F. Supp. 3d –––,

2026 WL 588117, at *60 (S.D.N.Y. Mar. 3, 2026). And the *ex post* effect on the courts would be equally dramatic, embroiling the courts in complex disputes regarding whether or not human safety was involved or property at risk in the rare cases in which an agreement or a lawsuit filed was reached. The Supreme Court itself has emphasized the perils of a judicial analysis of internal agency decisionmaking regarding whether and when to file a lawsuit. *Cf. Gabelli v. SEC*, 568 U.S. 442, 452 (2013) ("Determining when the Government . . . knew or reasonably should have known of a fraud [in order to pursue an enforcement action] presents particular challenges for the courts. Agencies often have hundreds of employees, dozens of offices, and several levels of leadership. In such a case, when does 'the Government' know of a violation? Who is the relevant actor?"). Koneru's argument would invite such an inquiry with respect to every lawsuit filed during a government shutdown. Such a consequence is not compelled, or even permitted, by the plain language of the ADA. The better interpretation of the ADA, and the one that the Court adopts here, is that the enforcement mechanisms for the statute are the ones that Congress provided—civil and criminal sanctions for the employees involved where the Executive chooses to charge such employees and reports to Congress. *See* Alan I. Saltman, *The Government's Liability for Actions of Its Agents That Are Not Specifically Authorized: The Continuing Influence of* Merrill *and* Richmond, 32 Pub. Cont. L.J. 775, 825 (2003) (arguing that because "the Anti-Deficiency Act . . . contains no admonition, penalty, or outright prohibition on an agency's negligently spending or committing available funds contrary to the substantive standards prescribed by Congress," "it is difficult to believe that Congress's intention . . . was to affect the validity of the Government's actions vis-à-vis third parties").

The cases cited by Koneru are not to the contrary. To be sure, the district court in *Davis & Associates, Inc.* used the language that a contract signed by an employee in violation of the

ADA was "void *ab initio*," 501 F. Supp. 2d at 80–81, but in that case a private party was seeking to enforce an agreement *against* the "District of Columbia government," to which Section 1341 equally applies, *see* 31 U.S.C. § 1341. The case did not involve a private party claiming it never had any obligations under a contract because the government employee who signed the agreement did so in violation of the ADA. *Davis* cites to a decision of the District of Columbia Court of Appeals, *Williams v. District of Columbia*, 902 A.2d 91 (2006), but that case too concerned a claim that a government action allegedly taken in violation of the ADA was invalid vis-à-vis third parties. In *Williams*, the court held that a government agency could disavow a contract that had been entered into in violation of the ADA; it did not hold that the government agency would be disabled from ratifying such an agreement after the fact. 902 A.2d at 95–96. *Davis* and *Williams* rely on *Hercules*, where the Supreme Court found that there was no "implied-in-fact agreement by the Government to indemnify for losses to third parties," not only because of the absence of any express indemnification provisions in the underlying contracts but also because "a contracting officer would not agree to [such an] open-ended indemnification" in light of their "presumed knowledge of [the ADA's] prohibition," which "bars a federal employee . . . from entering into a contract for future payment of money in advance of, or in excess of, an existing appropriation." 516 U.S. at 426–27. Critically, the Supreme Court did not reason from the principle that a contract violating the ADA is void *ab initio*, which would have resolved the question of open-ended indemnity contracts outright.[11] These cases do not provide support for the proposition that the SEC's enforcement action, filed during the government shutdown but

[11] An open-ended indemnity contract, at the time of contracting, would definitionally run the risk of exceeding appropriated funds. The Supreme Court could have relied on that basic proposition to find an open-ended indemnity provision void *ab initio* for violating the ADA at the moment of contracting, but the Supreme Court took a different tack that did not establish a *per se* rule.

otherwise undisputedly authorized, is without legal effect. *Cf. Henderson Cnty. Drainage Dist. No. 3 v. United States*, 55 Fed. Cl. 334, 338 (2003) ("[A]n agreement made by a government agent without authority can be subsequently ratified by an agent with express or implied actual authority if the ratifying official has actual or constructive knowledge of the unauthorized act.").

The Court's determination that an ADA violation does not revoke an agency's enforcement authority and consequently warrant dismissal comports with the prosaic notion that a government employee or officer who violates the rules of that agency or engages in other misconduct does not necessarily vitiate the agency's action itself. *See Bullock v. United States*, 10 F.4th 1317, 1322 (Fed. Cir. 2021) ("The general principle is that courts should be 'most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action.'" (quoting *Brock v. Pierce Cnty.*, 476 U.S. 253, 260 (1986)); *United States v. Boccanfuso*, 882 F.2d 666, 671 (2d Cir. 1989) ("Federal agencies do not lose jurisdiction by their failure to comply with statutory time limits unless the statute demonstrates congressional intent that this result occur, and the Court is reluctant to void subsequent agency action when an agency has failed to observe a procedural requirement but important public rights are at stake and less drastic remedies are available." (internal citations omitted)). Thus, a violation in an investigation or prosecution does not require a court to deem a case void *ab initio* or to automatically dismiss. Though Judge Posner stated in dicta that if the SEC has "violated legal or ethical rules governing its investigations in deciding to bring suit against [a subject], that may be sanctionable conduct, but it is not, without more, a defense to the SEC's suit," *Buntrock v. SEC*, 347 F.3d 995, 998 (7th Cir. 2003), such wisdom likewise rings true in the context of an ADA violation.[12]

---

[12] Because the Court determines that a violation of the ADA's voluntary-services bar does not

The Court's ruling today works no injustice on Koneru. Koneru received notice of the SEC's investigation well before the expiration of any applicable statute of limitations. He was not left "exposed to Government enforcement action" for some "uncertain period into the future." *See Gabelli*, 568 U.S. at 452. He has had and will continue to have the opportunity to press his defenses in this Court. And he has no personal interest in whether agency employees were working during the shutdown or not. The ADA was not passed for his especial benefit. If the Executive believes that an employee or officer has violated the ADA, it can take administrative or, in the most serious cases, criminal action. And if Congress believes that the ADA has been violated, then it can launch an investigation or—with appropriate authorization—perhaps bring a case to protect its prerogatives. *See Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 776 (D.C. Cir. 2020) (en banc) (holding that Judiciary Committee "has Article III standing to seek enforcement in federal court of its duly issued subpoena" because "[t]he Committee . . . was authorized by House Resolution 430 to bring the present lawsuit to enforce its subpoena"). And, of course, the agency can disavow an action taken without authority. But, as a matter of law, the ADA does not entitle Koneru to the windfall of—nor require the Court to order—dismissal, such that the SEC must refile this action and thereby lose out on its ability wholly or in part to seek civil penalties and disgorgement of Koneru's allegedly ill-gotten gains.

---

mandate dismissal of an agency enforcement action—the only relief Koneru seeks under the ADA—the Court need not consider whether the SEC's enforcement action would otherwise be authorized pursuant to the emergency exception. *See* Dkt. No. 31 at 1–2; 31 U.S.C. § 1342.

## II. Securities Act & Exchange Act Claims

Beyond his ADA defense, Koneru also claims that the complaint fails to state a viable securities fraud claim under either the Securities Act or Exchange Act. The Court provides a brief overview of the governing law before assessing the sufficiency of the pleadings.

### A. Legal Framework

In order to state a claim under Section 10(b) and Rule 10b-5(b) of the Exchange Act, the SEC must allege that "a person has (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) (internal quotation marks omitted). Scienter requires an "intent to deceive, manipulate, or defraud." *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n. 12 (1976)). "[S]cienter may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Id.* (internal quotation marks omitted). "The test for whether a statement or omission is materially misleading is not whether the statement is misleading in and of itself, but whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Manchin v. PACS Grp., Inc.*, 2026 WL 2621029, at *14 (S.D.N.Y. Sept. 4, 2026) (quoting *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016)) (citation modified). "The elements of a claim under § 17(a) of the Securities Act, which prohibits fraud in the 'offer or sale' of a security, 15 U.S.C. § 77q(a), are essentially the same as the elements of claims under § 10(b) and Rule 10b-5." *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016). However, as opposed to Section 17(a)(1) under the Securities Act, "violations of Sections 17(a)(2)–(3) . . . can be proven without scienter" and only

require a showing of negligence. *SEC v. Ginder*, 752 F.3d 569, 576 (2d Cir. 2014); *see* 15 U.S.C. § 77q(a).

### B. Application

Koneru argues that the SEC has failed to state a claim for relief because: (1) the complaint fails to allege any actionable material omissions; (2) certain statements are non-actionable puffery; and (3) the SEC has failed to allege a strong inference of scienter. Each contention fails to warrant dismissal.

#### 1. Misrepresentations and Actionable Half-Truths

The core fraud alleged in the SEC's complaint is that Koneru's statements regarding Triterras Fintech's Trade Finance module, both prior to the Business Combination and after, were "misleading" and created a "false impression" about the viability of the Kratos platform, the company's key asset. *See, e.g.*, Compl. ¶¶ 4, 7, 58, 94, 98. The SEC alleges that, through the Proxy Statement and investor presentations, Koneru gave investors the misleading impression that "the Kratos platform provided SME traders access to much needed trade financing from lenders; the platform had already established scale in volume and profits from trade and trade finance facilitated by the platform; and the platform had 'onboarded' ten lending funds that collectively managed an estimated $17 billion in assets (*i.e.*, the Ten Lending Funds)." *Id.* ¶ 57. The SEC thus claims that Koneru's statements "created the . . . impression that the platform's reported Trade Finance module volume and associated revenue was driven by the platform's successful facilitation of financing to SME traders for their commodities trades by the Ten Lending Funds." *Id.* ¶ 58.

The SEC alleges that this impression was false. For the fiscal year ended February 29, 2020, 100% of the trade finance volume on Kratos was based on Koneru-related activity and not generated independently from third parties. Koneru's related entity, Rhodium, was involved in

82% of the volume as a trader offering credit to a counterparty and the TAPL Fund (also a Koneru-related entity) in 18% of the volume as a lender—covering 100% of the trade finance activity. *Id.* ¶ 116. As for the six-month period of March to August 2020, 100% of the third-party financing for trades involved Rhodium borrowing from one of the Ten Lending Funds or the TAPL Fund providing financing to other traders. *Id.* ¶ 132. On the SEC's account, Koneru knew but did not disclose that TAPL was one of the Ten Lending Funds; that four others had never recorded a financing on the Trade Finance module; and the other five provided financing through the Trade Finance module only to Rhodium or Longview, both Koneru-related entities. *Id.* ¶ 59. Only 10% of the reported Trade Finance module volume involved the Ten Lending Funds, all of it implicated related entities, and 90% of the transactions involved two trader counterparties without financing sourced from any third party. *Id.* ¶¶ 108–09. He was further aware that, across both the Trade Discovery and Trade Finance modules, Koneru-related entities were on one side of a transaction or the other for 70% of the revenue generated in the fiscal year ended February 29, 2020, and 42% of the revenue for the six-month period ended August 31, 2020. *Id.* ¶¶ 126, 140.

Koneru contends nonetheless that, assuming the truth of the SEC's allegations, no reasonable investor could have been misled by his and Triterras's statements as a matter of law because of other contemporaneous disclosures. Koneru relies on statements made in the Proxy Statement and elsewhere regarding trade-credit extensions and the involvement of Koneru-related parties (*i.e.*, Rhodium, TAPL Fund). There, Triterras disclosed that "the Kratos ecosystem was enabled by our relationship with Rhodium" and that the "ability to facilitate trade financing to Kratos users is entirely dependent on the willingness of lenders and other traders . . . to finance the transactions and provide trade credit." Dkt. No. 26 at 27 (internal quotation

marks and emphases omitted). The Proxy Statement disclosed that Rhodium "enabled" the launch of Kratos and "initially provided immediate scale to the platform." Proxy Stmt. at 112. The Proxy Statement indicated that Rhodium was Triterras's "largest customer" and that it "helped kickstart the platform." *Id.* at 62–63. The Proxy Statement also disclosed that for the fiscal year ended February 29, 2020, "[s]ubstantially all of the users" were "referred" by Rhodium. *Id.* at 33. It further notified investors that the business "has substantially depended" on "Rhodium . . . to initially deliver customers . . . and any future changes in th[e] relationship may adversely affect" the company, particularly its ability to "grow the user base . . . on an independent basis." *Id.* (emphasis omitted). Koneru thus argues that investors were told that:

> (1) Rhodium was using the Kratos platform actively; (2) Rhodium was in the business of arranging trade financing; (3) Triterras "relied" on Rhodium for "Transaction Volume," i.e., the underlying physical commodity trades; (4) many of the other users of Kratos's platform were referred by Rhodium; (5) Rhodium generated significant platform fees for initiating commodity trades; and (6) buyers that "sourced" trade finance on the platform, whether from lenders or other traders, were charged platform fees.

Dkt. No. 26 at 28.

Koneru's argument fails to meet the nub of the SEC's claim. Koneru was subject to a duty to ensure that his statements to investors were not misleading. "Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017); *In re Mobileye Glob. Sec. Litig.*, 2025 WL 3640904, at *2 (2d Cir. Dec. 16, 2025) (summary order) ("Once a company speaks on a topic, it must 'tell the whole truth,' meaning that it may not 'omit material facts' necessary to make its statement not misleading, not that it must 'disclose all the facts that pertain to a subject.'" (quoting *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020))). "[T]he inquiry must focus not on whether 'particular statements, taken separately, were

literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities.'" *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 658 (S.D.N.Y. 2004) (quoting *DeMaria v. Anderson,* 318 F.3d 170, 180 (2d Cir. 2003)). "'[H]alf-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013); *see also Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021) (reiterating rule against half-truths). In considering the views of an objective reasonable investor, the Supreme Court has explained that such an investor "reads each statement . . . whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). "[A]n entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it materially misleading." *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 226 (S.D.N.Y. 2023) (alteration adopted) (quoting *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008)). To be actionable, such a half-truth must be material, *i.e.*, a plaintiff must allege facts showing that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).

As alleged by the SEC, Koneru's representations when taken together plausibly would have misled a reasonable investor. Triterras's disclosures about Rhodium are telling for what they do not disclose. Triterras painted a rosy picture for investors. It stated that the Kratos

platform was "solv[ing] some of the key underlying issues contributing to th[e] shortage of trade finance availability" for SME traders globally, Proxy Stmt. at 112, and that the Trade Finance module on "Kratos offers a solution" to fix "high administrative and compliance costs" that "less traditional investors" have faced, targeting the $1.5 trillion shortfall created by the departure of traditional banks from SME trade finance as Triterras's total addressable market, *id*. at 116. Especially pertinent to a prospective investor, Triterras noted that it monetized its market-making on Kratos by charging a small percentage fee on each transaction and financing conducted on the platform. *See id.* at 116–17 ("Our business is a 100% fee-based platform business."). At the time of its filing, the Proxy Statement announced that "Kratos has reached critical mass as a highly valuable tool for commodity trades and financiers, which in turn is driving significant revenue . . . independently of Rhodium, its largest customer that helped kickstart the platform." *Id.* at 62–63. It also represented that Triterras Fintech's ability to grow "independently of Rhodium" was "evidenced by . . . anticipated Transaction Volume of approximately US$7.8 billion and revenue of US$56 million, less than 15% of which is anticipated to be attributable to Rhodium's transactions" for the then-upcoming fiscal year. *Id.* at 112. Koneru further told investors that the Trade Finance module was "used by lenders or financial institutions to receive funding requests, to assess the funding opportunity and to provide funding to borrowers" and that $1.1 billion in Trade Finance volume had been transacted from inception to August 2020. Compl. ¶¶ 100–03 (internal quotation marks omitted). As Koneru repeatedly represented, Ten Lending Funds with "cumulative funds of approximately US$17 billion" had been "onboarded" to the Kratos platform. *See, e.g.*, *id.* ¶¶ 103, 170 (internal quotation marks omitted). Koneru did not disclose that 90% of the Trade Finance module financing was not third-party sourced credit but counterparties continuing to negotiate credit extensions as had been done before Kratos, and

the remainder involved Koneru-related entities—either the TAPL Fund providing loans or Rhodium receiving loans from the Ten Lending Funds. *Id.* ¶ 132. Koneru also did not disclose that his related entities, particularly Rhodium, accounted for nearly one-half to three-fourths of the revenue flow. *Id.* ¶¶ 126, 140.

The disclosures to which Koneru points would not have disabused a reasonable investor from the impression created by these statements and others that the Trade Finance module had successfully facilitated third-party financing to SME traders for their commodities trades. A reasonable investor might have understood from Koneru's statements that Rhodium had enabled the Trade Finance module and "kickstarted" Triterras's trade-financing revenue stream—but such an investor plausibly would not have understood that although the Trade Finance module's volume was initially generated by Rhodium, the module had not yet operated successfully on its own. Likewise, while such an investor also might have understood that a rupture of the relationship with Rhodium would have adversely affected Triterras, the investor would have had no reason to suspect that the impact would come in a form more harmful than the loss of the approximately 26.7% of revenue (around $4.5 million of a total $16.9 million in revenue) that Triterras had been able to earn for the fiscal year ending in February 2020 and the anticipated 15.5% it anticipated receiving in the subsequent period. And she would not have understood that Triterras was entirely dependent on Koneru's own related entity Rhodium, either as a counterparty in trades or as the receiver of financing from lenders, and that the only reason why Triterras was able to generate revenue was that Koneru, through Rhodium and other related entities, had steered that business. Most importantly, a reasonable investor would not have understood that the Ten Lending Funds did not independently contribute to Triterras's revenues. Koneru's defense that a reasonable investor would not be misled since the reported numbers

might be technically accurate exalts form over substance and does not warrant dismissing the SEC's claims. By sharing revenue metrics, Koneru and Triterras were obligated to not "omit[] critical qualifying information," *In re Vivendi S.A. Sec. Litig.*, 838 F.3d at 240 (quoting *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 (2016)), yet they allegedly did so by concealing the true magnitude of the company's reliance on Rhodium.[13]

Koneru relies on *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120 (2d Cir. 2011), *see* Dkt. No. 26 at 29, but that case does not support his argument. *Wilson* arose from the collapse of the market for auction rate securities ("ARS"). 671 F.3d at 123. Merrill had been an underwriter or sole or lead auction dealer on a large number of ARS auctions. *Id.* at 124. It described ARS as liquid and safe investments similar to money market funds. *Id.* at 124–25. In order to prevent auctions for the securities from failing, the firm would routinely place bids for its own account. *Id.* at 132. When the credit market deteriorated in the summer of 2007, Merrill and all other major dealers withdrew their support from the ARS market and, as a result, 87% of all ARS auctions failed, and investors were left with illiquid securities. *Id.* at 124. The plaintiffs in *Wilson* were purchasers in ARS auctions where Merrill was the sole or lead auction dealer and who were left with illiquid securities. *Id.* at 126–27. They brought market manipulation—and not misstatement—claims under Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

---

[13] Koneru contends that "trade finance" communicates that revenue may be predominantly from credit extensions, *see* Dkt. No. 26 at 31, but he identifies no evidence of which the Court can take judicial notice to support that proposition. Koneru thus asks the Court to determine prematurely that the term is only susceptible to one meaning—a task unfit for resolution at this stage. *See zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 792 F. Supp. 3d 407, 437 (S.D.N.Y. 2025) (rejecting defendants' argument that phrase in alleged misstatement was "a term of art" and holding that "defendants' self-serving spin as to the import of their public statements is 'entitled to little weight at this stage of litigation, when the Court must accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor'" (alteration adopted) (quoting *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015))).

The Second Circuit held that the plaintiffs' claims were properly dismissed. As a result of a prior SEC settlement, Merrill disclosed that auction procedures allowed it to buy and sell for its own account, that it routinely submitted orders for its own account "in its sole discretion," and that it "may routinely place one or more bids in an auction for its own account … to prevent an auction failure." *Id.* at 125–26 (internal quotation marks omitted). In the face of those disclosures then, a purchaser in any particular ARS market would be aware of the possibility that Merrill might place a support bid in the auction and that, in the absence of those bids, the auction might fail. *Id.* at 133. Plaintiff-appellant Wilson argued on appeal that the disclosures were nonetheless insufficient because Merrill "failed to apprise investors of the extent to which the market for Merrill ARS was dependent on Merrill's continued placement of support bids." *Id.* at 132. According to Wilson's argument, Merrill created a "façade of liquidity" and it "knew with certainty that . . . the market would fail unless it placed support bids." *Id.* at 125, 131 (internal quotation marks omitted). The Second Circuit rejected that argument because (1) it was "difficult to reconcile with what [wa]s alleged in [the] complaint," which stated that Merrill had a uniform policy to place support bids "if needed to prevent auction failures," *id.* at 132–33 (citation modified); and (2) the complaint failed to allege that the market would fail if Merrill did not intervene, *id.* at 133–34. In fact, certain of the allegations in the complaint suggested that ARS auctions were able to succeed, at least until the date after the plaintiff had purchased his securities. *Id.* at 134. The court concluded: "Taken together, these allegations do not support the inference that Merrill knew, *at the time of [appellant's] purchase*, that the ARS market was certain to fail in the absence of its intervention." *Id.* (emphasis in original).

*Wilson* is easily distinguishable. The SEC, unlike the plaintiff in *Wilson*, brings a misrepresentation and omission claim under Rule 10b-5(b).[14] More importantly, the SEC alleges, with factual claims to support the allegation, that Koneru created a "façade" that the Trade Finance module was self-sustaining, all the while concealing the extent to which it was reliant on Koneru-related entities. Taking the SEC's allegations as true, a reasonable investor would not have understood that there was a possibility that the activity on the Trade Finance module was all or primarily generated by Koneru-related entities. Such an investor, looking at the representations in their entirety, plausibly could have taken away the impression that, while Rhodium was important to Triterras, the Trade Finance module had attracted business from independent lenders with substantial assets under management and the company was not entirely dependent on Rhodium or the TAPL Fund.

**2. Non-Actionable Puffery**

Koneru requests that the Court dismiss the SEC's complaint to the extent it targets statements that are non-actionable puffery as a means to streamline proceedings.[15] "Statements are considered expressions of puffery when they are 'too general to cause a reasonable investor to rely upon them.'" *Meyer v. Organogenesis Holdings Inc.*, 727 F. Supp. 3d 368, 391 (E.D.N.Y. 2024) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)); *Rombach*, 355 F.3d at 174 ("[E]xpressions of . . . corporate optimism do not give rise to securities violations."). Koneru contends that his statements concerning a "compelling growth plan," "leading commodity trade & trade finance digital marketplace," "first mover advantage," "deliver[ing] previously unavailable access," and

[14] The SEC also alleges violations of Rule 10b-5(a) and (c). Compl. ¶ 206.
[15] Koneru does not request that the entirety of any specific count be dismissed on this basis. Dkt. No. 26 at 32 n.23.

"[p]roven business with extraordinary prospects" are all forms of puffery that the Court should excise from the SEC's pleading. Compl. ¶¶ 73, 75, 93 (internal quotation marks omitted); Dkt. No. 26 at 32–33.

The Court declines to do so. The SEC is not subject to the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") and need only satisfy Federal Rule of Civil Procedure 9(b).[16] *SEC v. Sason*, 433 F. Supp. 3d 496, 506 (S.D.N.Y. 2020). The Second Circuit "has read Rule 9(b) to require that a complaint (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170 (internal quotation marks omitted). But "courts need not on a motion to dismiss, determine if all statements alleged to be false and misleading are actionable as long as enough misstatements are actionable in order to state a cause of action," *SEC v. Shapiro*, 2018 WL 5999607, at *2 (S.D.N.Y. Nov. 15, 2018) (citation modified), because "one of the primary objectives of Rule 9(b)'s particularity requirement is to ensure that defendants receive fair notice of a plaintiff's claim [and] to enable preparation of a defense," *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 99 (2d Cir. 2023) (citation modified). Since the SEC has plausibly alleged actionable misstatements, Rule 9(b)'s particularity requirement and its objectives have been met at this stage. Koneru will have the chance to re-raise his arguments concerning puffery at a later point in this litigation (*e.g.*, summary judgment or motions *in limine*).

---

[16] The PSLRA's requirement that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1), does not apply to the SEC. *See Rio Tinto plc*, 41 F.4th at 52 n.4.

### 3. Scienter

Koneru also contends that Count II of the complaint, alleging violations of Section 10(b) and Rule 10b-6, and Count I, to the extent it alleges a violation of Section 17(a) of the Securities Act, should be dismissed for failure to adequately allege scienter. Dkt. No. 26 at 33.

Before delving into the specific allegations, the parties contest the standard for "scienter" when the SEC brings an action as opposed to a private plaintiff that would be subject to the PSLRA. Under the PSLRA, the Supreme Court has held that a "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Koneru asks the Court to apply the *Tellabs* standard, Dkt. No. 26 at 34–35, while the SEC contends "intent allegations 'should be allowed to survive a motion to dismiss based on fairly tenuous inferences of intent,'" Dkt. No. 30 at 37 (quoting *SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*, 296 F.R.D. 241, 248–49 (S.D.N.Y. 2013)).

The Second Circuit has not addressed whether the "cogent and compelling" standard applies to a SEC enforcement action alleging fraud, and its decisions regarding the application of such a standard outside the PSLRA context have pointed in different directions. In *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160 (2d Cir. 2015), the Second Circuit held that Rule 9(b) itself—and not just the PSLRA—required a plaintiff alleging fraud to state facts that created a cogent and compelling inference of fraudulent intent. The court stated that, although "Rule 9(b) allows mental states to be alleged generally," to survive a motion to dismiss, the plaintiff "must state facts sufficient to give rise to a strong inference of fraudulent intent." *Id.* at 176 (internal quotation marks omitted). It went on to quote *Tellabs* and to state that "[a]n inference is 'strong' if it is 'cogent and at least as compelling as any opposing inference one

could draw from the facts alleged.'" *Id.* at 177 (quoting *Tellabs*, 551 U.S. at 324). In a summary order, the Second Circuit has since cited *Loreley*'s "strong inference" requirement without adding the language regarding "cogent" and "compelling." *See Red Apple 86 Fleet Place Dev., LLC v. State Farm Fire & Cas. Co.*, 2024 WL 4764060, at *3 (2d Cir. Nov. 13, 2024) (summary order). Two years after *Loreley*, in *United States ex rel. Chorches for Bankr. Est. of Fabula v. American Medical Response, Inc.*, 865 F.3d 71 (2d Cir. 2017), the Second Circuit suggested that such a standard might be confined to the PSLRA context. There, in a case arising under the False Claims Act, the Second Circuit distinguished the pleading requirements of Rule 9(b) from those under the PSLRA, stating that Rule 9(b) required only a plausible inference of scienter as opposed to the PSLRA requirement that the inference of scienter be "cogent" and "compelling." *Id.* at 88–89 & n.14.[17]

Regardless of the specific standard, "[s]cienter can be established by showing either a 'motive or opportunity to commit the fraud' or 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *SEC v. Patel*, 794 F. Supp. 3d 111, 121 (E.D.N.Y. 2025) (quoting *SEC v. MiMedx Grp., Inc.*, 2022 WL 902784, at *6 (S.D.N.Y. Mar. 28, 2022)). And even measured against the more strident *Tellabs* standard, the SEC has adequately alleged a

---

[17] The district courts too have been divided on the pleading standard that applies to SEC enforcement actions alleging fraud. *Compare SEC v. Patel*, 794 F. Supp. 3d 111, 122 (E.D.N.Y. 2025) ("Under the [PSLRA], which supplements Rule 9, such plaintiffs need to plead scienter with particularity, but that statute (as its name makes unmistakable) does not apply to the SEC."); *Onyx Pharms., Inc.*, 296 F.R.D. at 248 n.4 ("Because the PSLRA applies only to private securities litigation, the Supreme Court's interpretation of 'strong inference' as used in the PSLRA does not apply to SEC enforcement actions."); *SEC v. Czarnik*, 2010 WL 4860678, at *6 n.4 (S.D.N.Y. Nov. 29, 2010) ("There is nothing to suggest, however, that the 'strong inference' standard as used in the PSLRA governs actions brought by the Commission."), *with Farnsworth*, 692 F. Supp. 3d at 185 (applying the *Tellabs* standard without discussion of its applicability to an action brought by the SEC); *SEC v. Zhabilov*, 2026 WL 882864, at *8 (S.D.N.Y. Mar. 31, 2026) (applying *Tellabs* standard).

strong inference of scienter for Koneru under either a motive-and-opportunity or circumstantial evidence approach.

First, Koneru had clear motive and opportunity to engage in the alleged scheme of taking Triterras Fintech public through the Business Combination at an inflated valuation, as a result of misleading statements, only to then take Triterras and its Kratos platform private at a steep discount. "Motive and opportunity requires allegations that a defendant benefitted in some concrete and personal way from the purported fraud. Generalized motives possessed by virtually all corporate insiders, such as the desire to sustain the appearance of corporate profitability, are insufficient." *La. Sheriffs' Pension & Relief Fund v. CVS Health Corp.*, 2026 WL 2532272, at *7 (S.D.N.Y. Aug. 27, 2026) (citation modified). As a result of the purported fraud, even beyond his equity stake and titles following the Business Combination, Koneru received $60 million in cash consideration that was not shared with or available to any other corporate insiders. Moreover, Koneru had the unique opportunity to take actions that would have resulted in his windfall, given that Rhodium and the TAPL Fund were entities directly or indirectly owned by Koneru and instrumental to the perceived success and financial reporting of Triterras Fintech and the Kratos platform. Considering the allegations altogether, this is not a situation, as Koneru claims, that would involve finding scienter based solely on incentives shared by "nearly all executives." Dkt. No. 31 at 25 (quoting *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 158 (D. Conn. 2007)).

Second, the SEC has independently alleged scienter through circumstantial evidence. "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting

that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (internal quotation marks omitted). The SEC has offered a bevy of circumstantial allegations that support a strong inference of an intent to defraud: (1) Koneru directed Triterras employees to record loans on Kratos from certain of the Ten Lending Funds, despite said loans being arranged off platform; (2) Koneru knew and had access to facts that undercut the trade financing story being told about the platform, including weekly status reports on the Kratos platform's lending funds, the July 2020 spreadsheet that Koneru directed a Triterras Fintech employee to not disclose in response to a due diligence request, and the December 2020 spreadsheet tracking trade financing and trader-to-counterparty credit extensions in separate tabs, all of which documented inactivity and non-deployment of the $17 billion in AUM from lenders that was advertised as accessible to traders; (3) Koneru personally signed off on the Proxy Statement and other SEC filings; and (4) after the Business Combination had consummated, Koneru continued to sign SEC filings that involved material misstatements that Koneru was made aware of by his staff. Dkt. No. 30 at 37–45. Koneru's responses are to suggest that the allegations are speculative or devoid of specific detail indicating that Koneru did in fact review emails and documents sent to him or authorize and make the statements that he ultimately signed. Dkt. No. 31 at 22–25. These arguments do not target Koneru's state of mind but rehash the materiality or falsity of the misstatements. *See, e.g.*, *id.* at 22 (contending the "off-platform loans" were not improperly recognized). Many of Koneru's points sidestep the crux of the SEC's allegations by arguing technical truthfulness or shifting focus away from then-existing alleged falsities. *See, e.g.*, *id.* at 23 (arguing that the "SEC does not allege plausibly that the reports informed Mr. Koneru that the Ten Lending Funds would fail to make loans to SME

traders" and urging the Court to consider "Triterras's status as a forward-looking" company, despite SEC allegations that there were then-existing misrepresentations in how the Ten Lending Funds were discussed with investors). Ultimately, these arguments do not counteract the strong inference of scienter established when all the indicia are weighed together, and even presuming the PSLRA applies, there is no equally strong non-culpable inference.

**CONCLUSION**

Accordingly, the motion to dismiss is DENIED. The Clerk of Court is respectfully directed to close Dkt. No. 25.

SO ORDERED.

Dated: November 19, 2026
New York, New York

LEWIS J. LIMAN
United States District Judge